## In re LION CAPITAL GROUP, et al., Debtors.

### Stanley T. LESSER, Trustee for Hamilton Gregg Monetary Management Limited, Plaintiff,

v.

### A–Z ASSOCIATES, et al., Defendants.

### Stanley T. LESSER, Trustee for Hamilton Gregg Asset Management Ltd., Plaintiff,

v.

### 931 INVESTORS, et al., Defendants.

**Bankruptcy No. 84–B–10668–72 (HCB). Adv. Nos. 84–5996A (HCB), 84–5997A (HCB).**

United States Bankruptcy Court, S.D. New York.

Feb. 12, 1985.

Kaye, Scholer, Fierman, Hays & Handler by Milton Sherman, New York City, for trustee.

Stroock, Stroock & Lavan by Lawrence Handelsman, New York City, for certain defendants.

## OPINION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Stanley T. Lesser, Trustee, has submitted an order implementing this Court's opinion of December 3, 1984, reported at 44 B.R. 690, —— BCD ——, (familiarity with which is assumed). There, it was determined that a motion to stay defendants from pursuing litigation in the district court and to dismiss certain counterclaims and defenses in an action brought to enforce contractual obligations payable on demand should be granted. Defendants object to that order on the grounds that these proceedings are not "core proceedings" as that term is employed in 28 U.S.C. § 157(b) enacted as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353 (1984). They assert that the order must instead be cast as findings of fact and conclusions of law for submission to the district court pursuant to 28 U.S.C. § 157(c)(1). The Trustee responds that, even if the proceeding is not found to be a core proceeding, the order is not a final order requiring approval by the district court under § 157(c)(1).

### I

The distinction in the bankruptcy courts' role in core versus non-core proceedings is the essence of the jurisdictional system designed by Congress in the wake of the Supreme Court's invalidation under Article III of the Constitution of 28 U.S.C. § 1471(b) in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598

(1982). Briefly, 28 U.S.C. § 1334 was amended to provide the district courts with jurisdiction over all "cases under title 11" and "all civil proceedings arising under title 11 or arising in or related to cases under title 11." Pursuant to § 28 U.S.C. § 157(a), the district courts are permitted to refer all such cases and proceedings to bankruptcy judges.[1] Acting as the bankruptcy court for the district,[2] bankruptcy judges are empowered by 28 U.S.C. § 157(b) to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11" which are so referred. If the proceeding is core, the bankruptcy judge can enter all appropriate judgments subject to appellate review by the district court. § 157(b). For those proceedings which are non-core but "otherwise related to a case under Title 11," the bankruptcy judge can hear them and "submit proposed findings of fact and conclusions of law to the district court and any final order or judgment shall be entered by the district judge" with those recommendations in mind, reviewing *de novo* only those matters to which a party has timely and specifically objected. § 157(c)(1). Determination of whether a proceeding is core is entrusted to the bankruptcy judge under § 157(b)(3).

## II

In support of his form of order, the Trustee asserts that its entry need not await determination of whether these proceedings are core or related proceedings under § 157(b). He claims that the order is not a final order and therefore requires not the imprimatur of a district court judge.

This assertion requires some explication of the opinion the order would implement in order to be understood. The motion before this Court sought several forms of relief: (i) the issuance of an order staying defendants from pursuing litigation against persons and entities related to the debtors-in-possession here pending determination of these adversary proceedings, (ii) dismissal of fraud based counterclaims pursuant to Rule 9(b) of the Federal Rules of Civil Procedure and (iii) dismissal of certain counterclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that they failed to state a claim upon which relief may be granted. In our opinion of December 3, 1984, it was determined that a stay should issue, that the Rule 9(b) motion should be granted with leave to amend and that the Rule 12(b)(6) motion should be granted to the extent of dismissing certain counterclaims brought pursuant to the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c). ("RICO").

 Of these various forms of relief, it would appear that only that portion of the order dismissing certain counterclaims under Rule 12(b)(6) would be a final order. While that term of art is not defined, the employment of "familiar legal expressions in their familiar legal sense employed connotes an intention by Congress that the words be accorded the same meaning, limitations and gloss previously attached to them." *Henry v. United States*, 251 U.S.

1. By order dated July 10, 1984, the district court for this district referred all such cases and proceedings to the bankruptcy judges for this district.

2. That the bankruptcy court remains is obvious from the revision of 28 U.S.C. § 151 which provides for such a court and from Congress having failed to disturb 28 U.S.C. § 1481 (1978) which grants to bankruptcy courts the powers of "a court of equity, law and admiralty." Any contention to the contrary would fail to account for the numerous references to the bankruptcy court in P.L. 98–353, *see e.g.*, 28 U.S.C. §§ 151, 152(c), 154(a), 154(b), 156(b), 156(c), 1930(d),

and the obvious need for a court to retain, not merely the power to hear cases, but also to act as a court able to enforce its orders through the power of contempt. There is not the slightest indication that Congress intended to create the anomalous situation of bankruptcy courts unable to enforce orders even in a core proceeding except upon invoking the power of a district court through the appeal process or with respect to a final order in a related proceeding. Such a situation would enable the parties to a bankruptcy case or proceeding to flout the orders of an adjunct court which, on reference, is able to exercise original and exclusive jurisdiction.

393, 395, 40 S.Ct. 185, 186, 64 L.Ed. 322 (1920).

■ District court orders dismissing complaints with leave to amend are not final decisions under 28 U.S.C. § 1291 (1982) and are thus not appealable. *Kozemchak v. Ukrainian Orthodox Church of America,* 443 F.2d 401 (2d Cir.1971). Similarly, injunctions *pendente lite* are not final orders but are interlocutory under 28 U.S.C. § 1292(a)(1) (1982) and may be appealed under that statute. Absent any evidence that Congress meant to accord the term "final order or judgment" as used in 28 U.S.C. § 157(c) a different meaning from that attached to it under 28 U.S.C. § 1291, these precepts would apply.

The defendants respond to this reasoning by observing that § 157(c)(1) provides the bankruptcy judges with power only to "hear" a non-core related proceeding and requires bankruptcy judges to submit findings and conclusions to the district court for consideration by it in entering a final order. They thus observe that bankruptcy judges are not expressly given the power to enter interlocutory orders.

This argument results from inartful draftsmanship for § 157(c)(1) indicates that the district courts may enter only final orders in related cases referred to the bankruptcy judges. Furthermore, the end result of the defendants' argument would require wholesale deferral of all interlocutory matters, such as orders regulating discovery and the like, to the district courts thereby swamping district court calendars.

■ In light of the burden on the district courts and on litigants that such wholesale referral would entail, we are reluctant to impute any such intention to Congress absent support for such an interpretation in the legislative history. Given the burdens described, and that Congress enabled the district courts to withdraw the reference under § 157(d), the absence of any such indication is hardly surprising. It consequently appears that Congress sought to involve the district courts only with respect to final orders in referred proceedings and that the bankruptcy courts are to issue interlocutory orders in related cases referred to them. The order, insofar as it would enjoin the defendants from proceeding with their district court actions against affiliates of the debtors and dismiss counterclaims and defenses with leave to amend, may, therefore, be entered without regard to whether the proceeding is core or non-core. But the order dismissing defendants' RICO counterclaims and defenses under Rule 12(b)(6) is unquestionably final. It thus compels determination of the nature of the proceeding. Furthermore, the parties agree that at this stage in these proceedings, determination of whether the proceeding is core or non-core is appropriate. 28 U.S.C. § 157(b)(3) provides that the bankruptcy judge is to make that decision. Accordingly, we now turn to that issue.

### III

■ Turning first, as we must in the exercise of interpretation, *e.g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976), to the statutory language of 28 U.S.C. § 157(b)(2), it is self-evident that Congress sought to define core proceedings by setting forth under that broad umbrella fifteen types of matters which fall thereunder but do not circumscribe its meaning; outer limits are left to be defined by the courts. Among the express inclusions, four are of interest here: "matters concerning the administration of the estate," "orders to turn over property of the estate," "allowance or disallowance of claims against the estate," and "other proceedings affecting ... the adjustment of the debtor-creditor or the equity security holder relationship...." In addressing these issues, § 157(b)(3) expressly commands that "determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."

### A. *Matters Concerning the Administration of the Estate*

■ Since the stay of defendants from pursuing their actions in the district court

is grounded on the harm to efficient administration of the debtor's estate that would likely occur absent a stay, the motion seeking such relief is undoubtedly a core proceeding within the meaning of the statute.[3] *Mahaffey v. E.C.P. of Arizona, Inc.*, 40 B.R. 469, 12 B.C.D. 164 (Bankr.D.Colo. 1984). Moreover, the phrase "matters concerning the administration of the estate" bears resemblance to the description by the Supreme Court in *Taylor v. Voss*, 271 U.S. 176, 46 S.Ct. 461, 70 L.Ed. 889 (1926) of the bankruptcy court's jurisdiction under the former Bankruptcy Act as pertaining to "matters of an administrative character including questions between the bankrupt and his creditors which are presented in the ordinary course of the administration of the bankrupt's estate." *Id.* at 181, 46 S.Ct. at 463. It is thus significant that under the former Bankruptcy Act referees had the traditional authority to issue injunctions to protect estate administration. *E.g., Sword Line Inc. v. Industrial Comm. of State of N.Y.*, 212 F.2d 865, 870 (2d Cir.), *cert. denied*, 348 U.S. 830, 75 S.Ct. 53, 99 L.Ed. 654 (1954); *In re Coger*, 319 F.Supp. 859, 861 (W.D.Va.1970); *In re Metzger's Inc.*, 68 F.Supp. 663, 664–66 (W.D.Mich.1946); Rule 701(5) of former Rules of Bankruptcy Procedure (1973).

### B. *Other Proceedings Affecting the Adjustment of the Debtor-Equity Security Holder Relationship*

■ As literally written, moreover, 28 U.S.C. § 157(b)(2)(*O*), in its inclusion of proceedings affecting adjustment of the debtor-equity security holder relationship, confirms that Congress must have intended adversary proceedings to collect capital contributions from limited partners to be treated as core-proceedings. Section 101(15)(B) of the Code defines equity security to include the "interest of a limited partner in a limited partnership." An equi-

ty security holder is defined by § 101(16) to be the holder of such an interest.

The defendants urge that § 157(b)(2)(*O*) refers to confirmation hearings under § 1129 of the Code where a plan could adjust the rights of equity security holders. That argument has no merit. Such hearings are embraced by § 157(b)(2)(L). Perforce, § 157(b)(2)(*O*) must refer to other matters. Furthermore, the Code distinguishes a bankruptcy case, within which such hearings are held, from a proceeding which is employed to denote adversary proceedings commenced pursuant to Part VII of the Rules of Bankruptcy Procedure and other contested matters. *See, e.g.,* 11 U.S.C. §§ 301, 302, 303, providing that a case is commenced with the filing of bankruptcy petition. The reference to "proceedings" thereby expresses an intention to embrace those adversary proceedings seeking such relief and abnegates any attempt to limit the term to the relief to that which might be awarded through confirmation of a plan within the bankruptcy case.

Since construction of a statute necessarily requires consideration of related statutory provisions, *e.g., Blue Chip Stamps v. Manor Drug Stores, Inc.*, 421 U.S. 723, 733, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975), it is plain that § 157(b)(2)(*O*) contemplates the suit brought here. Use of such a tool of statutory construction in deriving congressional intent is particularly apt in a case such as this where Congress, in passing P.L. 98–353 and thereby enacting 28 U.S.C. § 157, also revisited the Code, making numerous substantive amendments. It requires no divination to reason that Congress focused on the exact terms of the Code in crafting § 157(b)(2)(*O*).

### C. *Turnover Proceedings*

■ The same observation applies to § 157(b)(2)(E) which includes turnover proceedings in the definition of core proceedings. Turnover proceedings are conducted

---

**3.** As was noted in determining that a stay was warranted, the defendants at the hearing on that motion asserted that were they to prevail in the District Court action, they would seek to collaterally estop the trustee from litigating the issues resolved by the district court. In their latest brief, the defendants claim such assertion to be "purported." Reexamination of the transcript of that hearing reveals, however, that it was actually and unambiguously made.

pursuant to Part VII rules rather than by motion, *In re Riding*, 44 B.R. 846 (Bankr. D.Utah 1984) (unreported). Three types are provided in § 542 of the Code: (i) those seeking delivery or accounting for property of the estate that the trustee may use, sell or lease, or that the debtor may exempt, (ii) those seeking to compel "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order" to pay same to the estate, net of offsets under § 553 and (iii) those seeking to compel attorneys or accountants to turn over or disclose recorded information.

■ Here, the Trustee asserts that the contractual obligation of the limited partners to make capital contributions is matured and the limited partnership agreement itself makes that obligation payable on demand. No citation is required for the proposition that a chose in action or debt for breach of that agreement is property of the estate. Plainly read, the statutory language compels the conclusion that the proceeding brought by the Trustee is a core proceeding.

### IV

Yet it is precisely because the Trustee sues in contract that defendants assert his action is precluded from being a core proceeding. They observe that a statute should not be construed to implicate its constitutional validity and in this they are undoubtedly correct. Congress drafted that statute in light of *Marathon* and, with exception of personal injury and wrongful death claims, clearly intended its reach to be all that is constitutionally permitted. Construction of this statute thus requires examination, under *Marathon*, of the constitutional constraints on a specialized ad-

junct court created by Congress to aid the district courts in the exercise of Article III jurisdiction and the additional jurisdiction vested in them by Congress pursuant to Article I[4] in the resolution of state law causes of action.

■ From *Marathon* itself and from post *Marathon* cases upholding the constitutionality of the Magistrates Act of 1979, 28 U.S.C. § 636, largely on the basis of control by Article III courts, *see Fields v. Washington Metropolitan Area Transit Authority*, 743 F.2d 890, 893 (D.C.Cir. 1984); *Collins v. Foreman*, 729 F.2d 108 (2d Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984), it is clear that, under the actual holding in *Marathon*, the constitutional ability of an adjunct bankruptcy court to determine state law issues is to be determined by the nature and extent of control by Article III courts and whether there is a nexus between the proceeding involving a state law cause of action and the bankruptcy estate.

Concern for control is found in the *Marathon* plurality's emphasis on the independent nature of the bankruptcy courts created by 28 U.S.C. § 1471(b), as enacted by the Bankruptcy Reform Act of 1978. As Justice Brennan observed in remarking on that independent, not related to an Article III court, status,

... [P]erhaps most significantly, the relationship between the district court and the bankruptcy court was changed under the 1978 Act. Before the Act, bankruptcy referees were 'subordinate adjuncts of the district courts.' [H.R.Rep. No. 95–595] at 7. U.S.Code Cong. & Admin. News 1978, p. 5968. In contrast, the new bankruptcy courts are 'independent of the United States district courts.' *Ibid.;* Collier on Bankruptcy, ¶ 1.03, at

---

**4.** Congress is also given power in Article I to make uniform laws on the subject of bankruptcies. That this, and not the judicial power under Article III, is the source of our system of reorganizations and bankruptcy is obvious... But not only may the district courts be required to handle these proceedings but Congress may add to their jurisdiction cases between the trustee and others that, but for

the bankruptcy powers, would be beyond their jurisdiction because of lack of diversity required under Art. III.
*National Mutual Ins. Co. v. Tidewater Transf. Co.*, 337 U.S. 582, 594, 69 S.Ct. 1173, 1179, 93 L.Ed. 1556 (1949) (Plurality opinion by Jackson J.), (citations omitted), *contra, Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1208 (7th Cir.1984).

1–9 (15th ed. 1981). Before the Act, bankruptcy referees were appointed and removable only by the district court. 11 U.S.C. § 62 (repealed). And the district court retained control over the reference by his power to withdraw the case from the referee. Bkrtcy. Rule 102. Thus even at the trial stage, the parties had access to an independent judicial officer. Although Congress could still lower the salary of referees, they were not dependent on the political branches of government for their appointment. To paraphrase Justice Blackmun's observation in [*United States v.] Raddatz*, [447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424], the primary 'danger of a "threat" to the independence of the [adjunct came] from within, rather than without the judicial department.' 447 U.S., at 685, 100 S.Ct., at 2417 (concurring opinion).

458 U.S. at 79 n. 31, 102 S.Ct. at 2876 n. 31.

Delimitation of the actual holding in terms of peripherality echoes Chief Justice Burger's description of the result reached:

I write separately to emphasize that, notwithstanding the plurality opinion, the Court does *not* hold today that Congress' broad grant of jurisdiction to the new bankruptcy courts is generally inconsistent with Art. III of the Constitution. Rather, the Court's holding is limited to the proposition stated by Justice Rehnquist in his concurrence in the judgment—that a 'traditional' state common-law action, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law, must, absent the consent of the litigants, be heard by an 'Article III court' if it is to be heard by any court or agency of the United States. This limited holding, of course, does not suggest that there is something inherent-

ly unconstitutional about the new bankruptcy courts; nor does it preclude such courts from adjudicating all but a relatively narrow category of claims 'arising under' or 'arising in or related to cases under' the Bankruptcy Act.

458 U.S. at 92, 102 S.Ct. at 2882. As only a plurality decision, the concurring votes, those of Justice Rehnquist and Justice O'Connor, define *Marathon's* breadth. *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976). Justice Rehnquist joined by Justice O'Connor reasoned,

Marathon may object to proceeding further with this lawsuit on the grounds that if it is to be resolved by an agency of the United States, it may be resolved only by an agency which exercises 'the judicial power of the United States' described by Art. III of the Constitution. But resolution of any objections it may make on this ground to the exercise of a different authority conferred on Bankruptcy Courts by the 1978 Act, see *ante* at 54–55 [102 S.Ct. at 2862–2863], should await the exercise of such authority.

458 U.S. at 89–90, 102 S.Ct. at 2880–2881. The "different authority" referred to by Justice Rehnquist earlier in the opinion included "suits to recover accounts, controversies involving exempt property, actions to avoid transfers, preferences or fraudulent conveyances, and causes of action owned by the debtor at the time of the petition." *Id.* at 54, 102 S.Ct. at 2862.[5]

■ The issue of constitutional constraint on the ability of an adjunct bankruptcy court to issue final orders thus also requires consideration of the nexus between the purposes sought to be achieved through exercise of Article I power and the matter over which the court is asked to act.

---

**5.** Such causes of action obviously include state law causes of action. The statute commands that the impact of state law on resolution of the proceeding should not be dispositive. It is thus evident that Congress believed such descriptions, as in *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1208 (7th Cir.1984) of *Marathon* having invalidated the jurisdiction of bankruptcy courts to hear and determine adversary proceedings

that could have been brought in state court are *dicta.* As the Third Circuit observed: *"Northern Pipeline,* of course, held that non-Article III judges such as those of the bankruptcy court could not constitutionally exercise the broad jurisdiction conferred by 28 U.S.C. § 1471(b) over matters 'related to' bankruptcy." *Hanna v. Philadelphia Asbestos Co.,* 743 F.2d 996, 999 (3d Cir.1984).

Chief Justice Burger's concept of peripherality and Justice Rehnquist's reservation harken back to Chief Justice Vinson's description of the Congressional power to establish legislative courts:

It may be argued that the distinction between constitutional and legislative courts is meaningless if the latter may be invested with jurisdiction over the subjects of Article III judicial power. But there are limitations which insure the preservation of the system of federal constitutional courts distinct from legislative courts. In the first place a legislative court must be established under some one of the specific powers given to Congress, and it is unlikely that all of the subjects of the judicial power could be justified as an exercise of those powers. Furthermore, we cannot impute to Congress an intent now or in the future to transfer jurisdiction from constitutional to legislative courts for the purpose of emasculating the former.

*National Mutual Insurance Co. v. Tidewater Transfer Co. Inc.*, 337 U.S. 582, 644, 69 S.Ct. 1173, 1208, 93 L.Ed. 1556 (1949) (Vinson, C.J. dissenting) (footnote omitted).

Accordingly, the Second Circuit in *Collins* observed, in sustaining the constitutionality of the Magistrates Act from similar challenge on *Marathon* grounds, "The factors that seem to have concerned the *Northern Pipeline* plurality—that bankruptcy judges were not appointed by the district court and could not be removed by the district court, that bankruptcy courts were vested with independent jurisdiction and that district courts could not withdraw cases from bankruptcy courts, ... are simply not present under § 636(c)...." 729 F.2d at 115. The Second Circuit in *Kaiser* applied similar policy reasons in holding "absent a Supreme Court decision denying that power," 722 F.2d 1574 at 1581, that bankruptcy judges could constitutionally enter final judgments in non-related proceedings under the Emergency Rule. Among these were eliminating the "need for the district courts to enter every bankruptcy case at the beginning" thereby permitting them to tend to crowded calendars and providing all litigants a better opportunity to be heard and thereby recognizing the need for specialized expertise in bankruptcy while maintaining ultimate control in the district court through power to withdraw the reference.

## A. *New Court Structure*

In the application of these considerations, it is first to be observed that *Marathon* concerned a court structure vastly different from that crafted by the Bankruptcy Amendments and Federal Judgeship Act of 1984. As therein reconstituted, the bankruptcy courts are adjunct to the district courts where jurisdiction is vested pursuant to 28 U.S.C. § 1334 (1984). The bankruptcy courts assist, upon reference, in the exercise of the mandate subject to four considerable controls: withdrawal of the reference of both core and related proceedings pursuant to § 157(c)(2), the opportunity for *de novo* review by the district court of related proceedings pursuant to § 157(c)(1), retention of the ability of the district court to enter final orders and judgments in such proceedings as also provided by § 157(c)(1), and appointment of bankruptcy judges by the courts. 28 U.S.C. § 106, § 152 (1984).

On the basis of similar controls alone, the Sixth Circuit ruled that bankruptcy courts acting under the Emergency Rule could constitutionally entertain core and related proceedings. *White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254, 263-64. (6th Cir.1983). All of the controls relied on by the *White Motor* and *Kaiser* courts remain in place under § 157, save the application of the clearly erroneous rule to appeals from final orders and judgments in core-proceedings pursuant to Rule 8013 of the Rules of Bankruptcy Procedure. Congress' implicit deletion of the Emergency Rule's requirement of *de novo* review by the district courts for non-related cases is hardly of constitutional moment. *In Re Morrissey*, 717 F.2d 100 (3d Cir.1983). There the Third Circuit held that the Emergency Rule had to give way in that respect to Rule 8013 of the Rules of Bankruptcy

Procedure which were promulgated by the Supreme Court after *Marathon* and found, particularly given the source of the Rule, no unconstitutional diminution of adjunct status. The same reasoning applies to Rule 9015 providing for jury trials. While the Emergency Rule precluded the bankruptcy courts from conducting jury trials, the *White Motor* and *Kaiser* courts did not rely on that preclusion as an element of district court control. If the bankruptcy court can enter a judgment or final order in a core proceeding, there is no constitutional objection to its use of a jury trial in reaching its decision. *Matter of Paula Saker & Co., Inc.,* 37 B.R. 802, 11 B.C.D. 743 (Bankr.S.D.N.Y.1984). Particularly is that so since other Article I courts can constitutionally conduct jury trials. *Pernell v. Southall Realty,* 416 U.S. 363, 370, 94 S.Ct. 1723, 1727, 40 L.Ed.2d 198 (1974); *Capital Traction Co. v. Hof,* 174 U.S. 1, 5, 19 S.Ct. 580, 582, 43 L.Ed. 873 (1899).

■ Put in place to cure the deficiencies found by Justice Brennan in writing for the *Marathon* plurality, these controls and the vesting of jurisdiction in the district courts enable bankruptcy courts to serve as adjuncts assisting the district courts. The bankruptcy courts are no longer independently created bodies that exercise their own jurisdiction and whose members are appointed through the political process.

This change in status greatly enhances, in light of *Marathon,* the validity of enabling adjunct bankruptcy courts to determine state law causes of action. The controls, particularly control over the reference, are nearly tantamount to retention of justiciability in Article III courts. They cast the bankruptcy court as truly an adjunct, similar to the immemorable use of adjuncts by courts here and in England. McCabe, *The Federal Magistrates Act of 1979,* 16 Harv.J. on Legis. 343, 370, 372 (1979). The *Kaiser* court observed as much in holding that the presence of such controls in the Emergency Rule assisted in sustaining its constitutional validity. The *Collins* court is in apparent accord for, like

the consent provision of the Magistrates Act, 28 U.S.C. § 636(c), control over the reference "provides a constraint against the wholesale delegation of judicial power to adjuncts of the district court." *Collins,* 729 F.2d at 119.

■ That Congress has redrawn the bankruptcy courts as adjunct courts subject to considerable control by Article III courts thus speaks strongly in favor of a broad definition of core proceedings. The jurisdiction of Article III courts is hardly emasculated by such a system.

### B. *Nexus*

To these notions is to be added the considerable nexus between the exercise of Article I power to enable the district courts to refer core proceedings to the bankruptcy courts for final decision and the matters presented by these litigations. That Congress has decreed that administrative matters, adjustment of debtor-equity holder relations and turnover proceedings are core proceedings lends considerable constitutional weight to finding them to be exactly that. As the *Collins* court observed with respect to the Magistrates Act of 1979, "[t]he argument for constitutionality is now stronger, since Congress has specifically authorized the references in question after giving serious consideration to the constitutional arguments." 729 F.2d at 118. To defendants' assertion that *Marathon* limited that discretion, it is observed that such matters are hardly of the peripheral nature that Justices Rehnquist and O'Connor apparently viewed the *Marathon* proceeding to be. That action to collect damages for breaches of contract and warranty, coercion, misrepresentation and duress bore no relationship to the debtor's ability to reorganize and pay its creditors. The issues raised premised considerable discovery, exploration of the numerous elements of fraud, and potentially extensive damage calculations, all entailing great delay.

The "prime objective" of bankruptcy "remain[s] the simple one of getting creditors paid." *In re Grayson-Robinson Stores,*

*Inc.*, 320 F.2d 940, 949 (2d Cir.1963) (Friendly J.). Administrative matters, turn over proceedings to bring into the estate accounts receivable, insurance proceeds, and other matured debts payable on demand, and adjustment of debtor-equity security holder relationships are crucial to achievement of that goal. *E.g., Nowak, Tax Levies Under Section 542*, 55 Am. Bankr.L.J. 313, 342 (1981). That they be done quickly by a specialized adjunct court is particularly important in view of the automatic stay of creditors pursuing their state law remedies, as is now provided by § 362(a) of the Bankruptcy Code. To refer such matters to crowded district court calendars or to the even greater backlogged state court systems is to greatly impair, if not defeat, the goals of rehabilitation and payment of creditors.

Moreover, as the *Kaiser* court observed, the policy of relieving district courts from having to enter every bankruptcy proceeding at the outset affords "all litigants a better opportunity to have their day in court." 722 F.2d at 1581. The alternative is simply not palatable, "[s]imply creating more [Article III] judgeships to cope with increased court business is a long, expensive, frustrating and often inefficient procedure for reducing court congestion." Kaufman, *The Judicial Crisis, Court Delay and the Para-Judge*, 54 *Judicature* 145, 147 (1970).

And to this is to be added the further observation of the *Kaiser* court: "[A]ll cases are not appealed. There should be at least one adjudication made by a judge with expertise in bankruptcy law. There is no assurance that a better initial determination would be made by a district court." 722 F.2d at 1581. Particularly is that so in proceedings seeking to collect on matured claims payable on demand, or to adjust debtor-creditor or debtor-equity security holder relations, for they occur on a sufficiently frequent basis that bankruptcy judges soon become expert in handling them and the state law issues they entail.

Not to the contrary is *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir.1984), upon which defendants rely. There, the Third Circuit held that a product liability action against an independent distributor was not a proceeding related to the bankruptcy case of the supplier of the products and therefore not removable to the bankruptcy court. In so holding, the court ruled that the test of relatedness is

> whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy ... Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which, in any way impacts upon the handling and administration of the bankrupt estate.

743 F.2d at 994 (citations omitted). Here the nexus is stronger, justifying treatment as core proceedings.

To the lack of constitutional constraint in construing 28 U.S.C. § 157 in accordance with the plain meaning and thereby finding the trustee's causes of action to be core proceedings, the defendants would observe that the fraud-based counterclaims and defenses they intend to replead will inject into these proceedings exactly the complexity and delay that characterized the action in *Marathon*, and that thus these proceedings should not be considered to be core matters. This position is without merit for three principal reasons.

First, claims against the estate are deemed by § 157(b)(2)(B) to be core proceedings. That section includes counterclaims. *In re Duo Metal & Iron Works, Inc.*, 45 B.R. 139 (Bankr.E.D.Pa.1984) (unreported). Adjustment of claims against an estate has been and remains central to bankruptcy proceedings. Second, the counterclaims will have to be appropriately ranked in the bankruptcy proceeding and that ranking raises its own specialized bankruptcy issues. To the extent that the counterclaims arise out of the allegedly fraudulent sale of partnership interests, they present subordination issues to be ad-

dressed by bankruptcy courts. *In re Stirling Homex Corp.*, 579 F.2d 206 (2d Cir. 1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979). To the extent, the proceedings are considered turnover proceedings, defendants will assert that they are to set them off, as § 542 provides, against the Trustee's claims under § 553 of the Code thus raising mutuality and other issues special to that section. Third, defendants have asserted additional defenses concerning the trustee's power and standing to represent the partnership and thereby call upon them for additional capital contributions. That issue should be handled by the bankruptcy court for the impact of bankruptcy on a partnership and the ability of a trustee to realize upon its causes of action fall within its specialization.

These proceedings are thus core proceedings under the Code to be heard and determined by this court pursuant to the reference and 28 U.S.C. § 157(b).

IT IS SO ORDERED.