In the Matter of BALDWIN–UNITED CORPORATION, D.H. Baldwin Company, et al., Debtors.

B–U ACQUISITION GROUP, INC., Plaintiff,

v.

UTICA MUTUAL INSURANCE COMPANY, the North River Insurance Company, Fireman's Fund Insurance Company, Midland Insurance Company, First State Insurance Company, Employer's Mutual Casualty Company, Integrity Insurance Company, Defendants.

Bankruptcy No. 1–83–02495.
Adv. No. 1–85–0174.

United States Bankruptcy Court,
S.D. Ohio, W.D.

Aug. 30, 1985.

---

Martin Glenn, O'Melveny & Myers, Los Angeles, Cal., for plaintiff.

Stephen Black, Douglas Prince, John Hust, David W. Peck, Cincinnati, Ohio, for defendants.

## ORDER

RANDALL J. NEWSOME, Bankruptcy Judge.

This Chapter 11 adversary proceeding is before the Court upon the motions of all defendants to dismiss for lack of subject matter jurisdiction, or in the alternative to abstain, pursuant to Bankruptcy Rule 7012, Rule 12(b)(1) of the Federal Rules of Civil Procedure, and 28 U.S.C. § 1334(c). Defendants Midland Insurance Company, First State Insurance Company, Employer's Insurance Company and Integrity Insurance Company ("the fourth-layer insurers") have also moved to dismiss this action for failure to state a claim upon which relief can be granted pursuant to Bankruptcy Rule 7012 and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

This action arises out of a suit filed in 1979 by Frank McCullough against S & H Insurance Company, S & H Life Insurance Company, and what is now known as B–U

Acquisition Group, Inc.[1] The gist of the lawsuit is that in May of 1974 the defendants fraudulently induced McCullough to accept an offer to become president of the S & H insurance companies; that he was authorized to hire his own employees; that he and his employees were promised a 20% cash bonus based on annual net profits; that his employment was guaranteed through 1985; that the companies' performance substantially improved under his management resulting in large profits; and that he and his employees were wrongfully terminated on April 14, 1978 in order to deprive them of the bonus resulting from those profits.

After a number of years of pretrial proceedings, on October 19, 1984 trial on McCullough's complaint commenced in the Los Angeles Superior Court. On January 23, 1985, the jury returned a general verdict in McCullough's favor, awarding him $4 million in compensatory and $8 million in punitive damages against Sperry & Hutchinson, and a total of $8 million in damages against the S & H insurance companies. The $20 million judgment was later reduced to $10 million by the trial court's remittitur, to which McCullough consented.

Largely as a result of this judgment, on March 22, 1985 B–U Acquisition Group, Inc. filed a Chapter 11 petition in this Court. Thereafter, on April 9, 1985 debtor filed this adversary proceeding seeking a declaratory judgment that certain insurance companies are required to indemnify it for the amount of the McCullough judgment as well as all other costs arising from that suit. The suit also seeks compensatory and punitive damages for breach of the insurance contracts and bad faith refusal to provide coverage, attempt to settle, or post an appeal bond.

Specifically, debtor's complaint alleges that throughout 1978 and 1979, the S & H entities sued by McCullough were insured under a comprehensive general liability pol-icy issued by Utica Mutual Insurance Company. During that same period, they were also insured under a $10 million excess insurance policy issued by North River Insurance Company, and a $5 million excess policy issued by Fireman's Fund Insurance Company. On January 18, 1979 a fourth layer of insurance was purchased in the form of a $25 million excess policy from a group of four insurers. The expiration date of that policy was January 1, 1980.

Debtor alleges that Utica was given written notice of the McCullough claim on July 14, 1983, and that the excess carriers were notified on July 23, 1983. Utica agreed to undertake the defense of the McCullough action on September 1, 1983, subject to a reservation of rights. The excess carriers allegedly did not respond to this notice or subsequent requests by the debtor to engage in settlement efforts.

Without seeking or obtaining relief from the automatic stay imposed by 11 U.S.C. § 362, on May 31, 1985 North River filed a declaratory judgment action in California state court naming the debtor and its other insurers and seeking an adjudication of essentially the same issues presented in this case.

In what has become a ritual in adversary proceedings filed since the effective date of the Bankruptcy Amendments and Federal Judgeship Act of 1984, the defendants challenge the jurisdiction of this Court to hear this action on a variety of grounds. North River and Fireman's Fund assert that this proceeding is not a "core proceeding" under 28 U.S.C. § 157(b)(2), but rather falls within the category of a proceeding that is "otherwise related to a case under title 11." See, 28 U.S.C. § 157(b)(3). The fourth-layer insurers go further, asserting that since this matter involves only state law issues, the Court has no jurisdiction of any kind under 28 U.S.C. § 1334. The debtor counters that this proceeding is so intimately related to the "liquidation of the assets of

---

1. Between October 19, 1900 and November 4, 1981, the name of this company was "The Sperry and Hutchinson Company". It became "S & H Group, Inc." on November 4, 1981, and on February 7, 1985, its name was changed to B–U Acquisition Group, Inc. Only The Sperry and Hutchinson Company is named as a defendant in the complaint.

the estate or the adjustment of the debtor-creditor ... relationship" as to make it a core proceeding under 28 U.S.C. § 157(b)(2)(O). In the alternative, debtor asserts that this matter is in the nature of a turnover proceeding encompassed by 11 U.S.C. § 157(b)(2)(E).

To state that the jurisdictional questions raised by the parties are unsettled is to acknowledge the painfully obvious. The jurisdictional battles which were envisioned with the passage of the 1984 Amendments have become a reality as is evident from the cascade of published decisions on the subject. The source of the problem was pinpointed by Judge Gilbert Merritt in *In re White Motor Credit*, 761 F.2d 270, 271 (6th Cir.1985):

> The new Act has a number of conflicting provisions and is confusing to say the least. It divides bankruptcy matters into "cases," "proceedings arising under" bankruptcy, "proceedings arising in" bankruptcy, "proceedings related to" bankruptcy and "core proceedings." No category of cases other than "core proceedings" is defined in any way, and there is no House or Senate report of any kind and no conference report.

The Courts and commentators are sharply divided on the reach of the Bankruptcy Court's core proceeding jurisdiction, and the decisions addressing the question are not susceptible to complete harmonization. The major point of divergence appears to center not only upon the statute and the intent of Congress, but upon the constitutional infirmity which Congress intended to remedy. The discussion almost inevitably returns to the illusive subject of what the Supreme Court of the United States truly held in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Courts which have adopted a restrictive approach to core proceeding jurisdiction have done so based on the belief that state law causes of action are automatically deemed "related to" proceedings under the plurality opinion in *Marathon;* that only a state court or Article III court may try

such actions absent consent of the parties; and that the 1984 Amendments were drafted with the intent of depriving the Bankruptcy Courts of all jurisdiction over state law claims, regardless of the nature of those claims and their relationship to the underlying bankruptcy case. *See, e.g., UNR Industries, Inc. v. Continental Insurance Company*, No. 83A2523 (N.D.Ill. April 9, 1985); *State Bank of Lombard v. Chart House, Inc.*, 46 B.R. 468 (N.D. Ill.1985); *In re Smith-Douglass, Inc.*, 43 B.R. 616 (Bankr.E.D.N.C.1984); *In re Atlas Automation, Inc.*, 42 B.R. 246 (Bankr.E.D. Mich.1984); *In re Dakota Grain Systems, Inc.*, 41 B.R. 749 (Bankr.D.N.D.1984).

Other courts have taken a more expansive approach to core proceeding jurisdiction premised in large part on a much narrower reading of *Marathon*. These courts view Justice Rehnquist's concurring opinion in *Marathon* as governing the decision's scope, and have determined that the constitutional infirmity in the Bankruptcy Court's jurisdiction which Justices Rehnquist and O'Connor discerned was far less pervasive than that found by the plurality. This view was eloquently set forth by Judge Howard Buschman in *In re Lion Capital Group*, 46 B.R. 850, 856 (Bankr.S. D.N.Y.1985):

> [I]t is clear that, under the actual holding in *Marathon*, the constitutional ability of an adjunct Bankruptcy Court to determine state law issues is to be determined by the nature and extent of control by Article III courts and whether there is a nexus between the proceeding involving a state law cause of action and the bankruptcy estate.

Thus, the crux of the problem with 28 U.S.C. § 1471 as identified by Justice Rehnquist and addressed by Congress was the total inability of litigants to obtain an initial adjudication of any kind on any matter by an Article III court. Far from intending to dismantle the system established by the 1978 Code and strip Bankruptcy Courts of authority to hear state law claims, Congress drafted a statute with the intent that

"its reach ... be all that is constitutionally permitted." *In re Lion Capital Group, supra,* at 856. To solve the constitutional problem without overburdening the already beleaguered District Courts and without destroying the ability of Bankruptcy Courts to expeditiously and efficiently administer the debtor's estate, Congress dissolved the Bankruptcy Court as an independent body, vested all bankruptcy jurisdiction in the District Court, and made the Bankruptcy Court an adjunct of the District Court with the assigned function of assisting the District Court in exercising its bankruptcy jurisdiction. Control over that jurisdiction, however, remains in the District Court by way of withdrawal of the reference (28 U.S.C. § 157(c)(2)), de novo review of related proceedings (§ 157(c)(1)) and entry of final orders in related proceedings (§ 157(c)(1)). *In re Lion Capital Group,* at 858 (Bankr.S.D.N.Y.1985); *See also, In re DeLorean Motor Co.,* 49 B.R. 900, 13 B.C.D. 60 (Bankr.E.D.Mich.1985) (Graves, B.J.).

As is evident from this Court's decision in *In re Baldwin-United Corp,* 48 B.R. 49 (Bankr.S.D.Ohio 1985), the undersigned's reading of *Marathon* and the 1984 Amendments is in agreement with Judge Buschman's cogent analysis. A fair reading of both the plurality and concurring opinions in *Marathon* indicates that the jurisdictional provisions of the 1978 Code might well have been found to be constitutional had preemptive control over bankruptcy jurisdiction been vested in the District Court and had the Bankruptcy Court truly constituted an adjunct of the District Court.

This conclusion is reinforced by the Supreme Court's extensive discussion of *Marathon* in *Thomas v. Union Carbide Agricultural Products Co.,* —— U.S. ——, 105 S.Ct. 3325, 87 L.Ed.2d 409 (U.S.1985), wherein Justice O'Connor, in writing for the majority, stated as follows:

> The Court's holding in that case [*Marathon*] establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, *and subject only to ordinary appellate review.* —— U.S. at ——, 105 S.Ct. at 3334–3335 (emphasis added).

Justice Brennan's concurring opinion is even more telling in this regard. He painstakingly notes that while the plurality in *Marathon* found the 1978 jurisdictional provisions to be an unconstitutional assignment of Article III decision-making authority to an Article I tribunal, the provisions might have been saved had preemptive control over bankruptcy jurisdiction resided in the District Court:

> *Because the challenged bankruptcy jurisdiction could not be sustained on the alternative rationale that it was a proper adjunct to an Art. III court.* ... the statute embodying the jurisdictional grant was declared unconstitutional. at ——, 105 S.Ct. at 3342 (emphasis added).

■ When the narrow holding of *Marathon* is read in combination with pertinent provisions of the 1984 Amendments, we conclude that the primary intent of Congress was not to divest the Bankruptcy Court of all authority to adjudicate state law claims; rather, it was to create a system which meets the constitutional need for vesting the "essential attributes of judicial power" (*Marathon, supra,* 458 U.S. at 81, 102 S.Ct. at 2876) in an Article III Court while also meeting the practical need for an adjunct to assist the District Court in exercising that jurisdiction as to matters arising under both state law and bankruptcy law.

To hold otherwise would require us to ignore the enormous breadth of the subject matter encompassed by the language of many of the subparts in the list of core proceedings found in § 157(b)(2); to ignore the non-exclusive nature of that list; and to ignore the specific statutory direction that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." 28 U.S.C. § 157(b)(3). We would also be required to

assume that Congress did not understand the essential nature of proceedings in Bankruptcy Court, which, as Justice Powell noted in his dissenting opinion in *Marathon*, "is constantly enmeshed in state-law issues." 458 U.S. at 97, 102 S.Ct. at 2885.

Finally, we would have to assume that Congress was unaware of decisions by the United States Courts of Appeals which have read *Marathon* as merely requiring an adjunct system which properly allocates jurisdictional authority. The retention of jurisdictional control was the key to the Court's ruling in *White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254, 263 (6th Cir. 1983), wherein the court upheld the constitutionality of the Emergency Rule on the following grounds:

> We believe that the powers reserved by the district courts in the interim rule satisfy the Supreme Court's concern that Art. III courts adjudicate bankruptcy cases. The constitutional rights of the parties to a bankruptcy proceeding are not violated when the Bankruptcy Courts with derivative jurisdiction assist the district courts.

*Accord In re Kaiser*, 722 F.2d 1574, 1581 (2d Cir.1983). The same conclusion was later reached in *In re Burley*, 738 F.2d 981, 985 (9th Cir.1984), where the constitutionality of the Ninth Circuit Bankruptcy Appellate Panel was upheld:

> *Marathon* stated that non-Article III officers may constitutionally perform judicial functions so long as an Article III judge retains the "essential attributes of the judicial power." *See*, 458 U.S. at 80–81, 102 S.Ct. at 2876–2877. The role of the BAP in the appellate process is constitutional because the court of appeals retains those "essential attributes ..."

In rejecting the theory that the state law nature of the cause of action is the paramount factor in the determination of "core" versus "related to" jurisdiction, we do not mean to suggest that this factor should play no part in our determination. As is evident from the five abstention provisions in the statute as well as the remarks of certain legislators, concerns over the intrusion of the federal courts into legal matters reserved to the sovereign authority of the state obviously came into play in drafting the 1984 Amendments. Nor would we suggest that the question of "core" versus "related to" jurisdiction should hinge exclusively on the importance of the cause of action to the reorganization or efficient administration of the estate. A slavish adherence to the former theory would eventually lead to an unwarranted limitation on the boundaries of core proceeding jurisdiction, while wholesale adoption of the latter theory would ultimately lead to a total emasculation of "related to" jurisdiction.

Just as Congress attempted to strike a balance between the need for a constitutional bankruptcy system and the need for a viable, efficient one, so should the courts. Toward that goal, a number of factors should be considered in determining whether a proceeding is "core" or "related to", including the following:

1. *Does the proceeding fall within one of the specific categories of core proceedings set forth in 28 U.S.C. § 157(b)(2)?*

   As was noted in *In re Lion Capital Group*, 46 B.R. 850, 859 (Bankr.S.D.N.Y.1985):

   That Congress has decreed that administrative matters, adjustment of debtor-equity holder relations and turnover proceedings are core proceedings lends considerable constitutional weight to finding them to be exactly that.

2. *To what extent does the resolution of the proceeding impact upon the bankruptcy case? Does the ability of the debtor to reorganize and pay its creditors hinge on the quick resolution of the proceeding, or is the proceeding merely "peripheral" to the case? Marathon, supra, 458 U.S. at 92, 102 S.Ct. at 2882 (Burger, C.J., dissenting).*

3. *Is the proceeding one which the Bankruptcy Court traditionally has been empowered to decide?*

While the concepts of summary and plenary jurisdiction under the 1898 Act were not revived in the 1984 Amendments, those concepts do bear some resemblance to "core" and "related to" jurisdiction. Thus the substantial body of case law developed under the 1898 Act may provide useful guidance for defining the reach of the Bankruptcy Court's jurisdiction under the new statute.

4. *Is there a "federal rule of decision provided for any of the issues in the lawsuit?" Marathon, supra,* at 90, 102 S.Ct. at 2881 (Rehnquist, concurring).[2] *If the proceeding arises entirely under state law, does it present substantial questions of law and fact for adjudication?*

In the final analysis, the right preserved by the Supreme Court in *Marathon* was the right to have traditional common law actions adjudicated by an Article III court, or by an adjunct sufficiently controlled by an Article III court. In our view, those courts which have equated state law claims with "related to" proceedings without examining the extent to which the issues presented require actual decision making of any kind miss the point of *Marathon.* While an adversary proceeding seeking a substantial damage award for the breach of an alleged oral contract to construct a building and an adversary proceeding seeking to collect on a $1000 account receivable or promissory note are both governed by state law, the account receivable action may not implicate the right protected in *Marathon,* since it may not require the adjudication of any substantial issue of fact or law. Indeed, most such actions involve debts which are "matured, payable on demand, or payable on order" and thus subject to collection through a turnover proceeding under 11 U.S.C. § 542(b). Indeed, many times both the fact and amount of the debt is virtually undisputed.[3]

The classification of such proceedings as "related to" merely because they arise under state law ignores the thrust of *Marathon* and the specific language of 28 U.S.C. § 157(b)(3), while potentially overburdening the District Courts with insignificant or nonexistent disputes. *Accord In re Franklin Computer Corp.,* 50 B.R. 620, 13 B.C.D. 209, 213 (Bankr.E.D.Pa.1985). Neither the Supreme Court nor Congress could have intended such a result.

■ After weighing each of the factors listed above, we conclude that this is a "related to" proceeding.[4] Initially, we note

---

2. While not elaborating on this statement, we assume that the concurring Justices were referring to those occasions when bankruptcy law or some other federal law would govern the resolution of an issue. As was noted in *Chicago Board of Trade v. Johnson,* 264 U.S. 1, 10, 44 S.Ct. 232, 234, 68 L.Ed. 533 (1924):

Congress derives its power to enact a bankrupt [sic] law from the Federal Constitution, and the construction of it is a federal question. Of course, where the bankrupt law deals with property rights which are regulated by the state law, the federal courts in bankruptcy will follow the state courts; but when the language of Congress indicates a policy requiring a broader construction of the statute than the state decision would give it, federal courts cannot be concluded by them. *See also, Segal v. Rochelle,* 382 U.S. 375, 381 n. 6, 86 S.Ct. 511, 516 n. 6, 15 L.Ed.2d 428 (1966) ("what would constitute a 'transfer' is a matter of federal law"); *In re Madeline Marie Nursing Homes,* 694 F.2d 433, 436–437 (6th Cir.1982) ("Case Law has further established that the bankruptcy courts, as courts of the United States, have power to supercede state law where

it conflicts with the federal bankruptcy law which the court is primarily bound to enforce.")

3. Even the case law which evolved under the 1898 Act recognized the power of the bankruptcy court to hear such matters, so long as there were no "substantial issues of law or fact as to the existence of a debt." *In re Atlas Concrete Pipe, Inc.,* 668 F.2d 905, 910 n. 9 (6th Cir.1982); *see also, In re F & T Contractors, Inc.,* 649 F.2d 1229, 1234 (6th Cir.1981) ("A bankruptcy court has jurisdiction over such claims because there are no real issues of law or fact between the parties; rightful possession clearly lies with the trustee."); *Morrison v. Rocco Ferrera & Co., Inc.,* 409 F.Supp. 1364, 1369–70 (E.D.Mich.1975), *aff'd* 554 F.2d 290 (6th Cir.1977), *cert. denied* 434 U.S. 925, 98 S.Ct. 405, 54 L.Ed.2d 283 (1977).

4. Since the outcome of this proceeding obviously will have some effect on the bankruptcy estate (*Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984)), we find no merit in the fourth-layer's argument that this proceeding is not even within this Court's "related to" jurisdiction.

.that debtor's insurance coverage and bad faith claims do not fall neatly into any of the core matters specifically enumerated. We would be required to stretch the language of § 542(b) to the breaking point in order to find that the defendants owe a debt which is "matured, payable on demand, or payable on order," and that this is a turnover proceeding under § 157(b)(2)(E). Indeed, certain of the defendants contend that they owe the debtors nothing. For much the same reason, to term this proceeding as one "affecting the liquidation of the assets of the estate" would require an overly-expansive reading of § 157(b)(2)(O). Furthermore, the proceeding involves issues of California law exclusively, and those issues will undoubtedly be hotly contested and substantial. While certainly not dispositive of the question, we further note that the adjudication of debtor's causes of action probably would have been beyond the summary jurisdiction of the Bankruptcy Court under the 1898 Act. *See Palmer v. Travelers Ins. Co.,* 319 F.2d 296 (5th Cir.1963).

We are well-aware of the importance of this lawsuit to the debtor. However, this bankruptcy case is but a small segment of the overall reorganization of the Baldwin-United system. When viewed in that context, rather than in isolation, we cannot find that the resolution of this dispute is so crucial to the administration or reorganization of the debtor as to outweigh the other factors discussed above.

■ The remainder of the defendants' assertions require considerably less discussion. Their argument that this Court must abstain under 28 U.S.C. § 1334(c)(2) is unsupportable. Abstention under that section is required only if "an action is commenced, and can be timely adjudicated in a State forum." By its May 31, 1985 filing of a declaratory judgment action against the debtor in California state court, defendant North River has attempted to bootstrap its way into the provisions of the statute. Putting aside the substantial question of whether an action must already be pending in state court before mandatory abstention

can be triggered, (*see, In re Boughton,* 49 B.R. 312, 315 (Bankr.N.D.Ill.1985) ), we are confident that Congress did not intend that mandatory abstention could be manufactured through a flagrant violation of the automatic stay. Since actions taken in violation of that stay are void *ab initio (In re Thacker,* 24 B.R. 835 (Bankr.S.D.Ohio 1982) ), the California action must be treated as though it were never commenced.

Even if we were inclined to hold otherwise, we have substantial doubts as to whether the California action could be "timely adjudicated," given the well-known log jam of litigation in the California state courts. *Accord, In re Boughton, supra,* at 315–316; *In re DeLorean Motor Co.,* 49 B.R. 900, 13 B.C.D. 60, 67 (Bankr.E.D.Mich. 1985).

■ Defendants' arguments under the discretionary abstention provisions found in § 1334(c)(1) are equally unavailing. This proceeding does not involve unsettled issues of state law; to the contrary, principles of insurance coverage and an insurer's duty of good faith and fair dealing are well-developed in the case law of California. *See, e.g. Samson v. Transamerica Ins. Co.,* 30 Cal.3d 220, 178 Cal.Rptr. 343, 636 P.2d 32 (1981); *Twentieth Century-Fox Film Corp. v. Harbor Ins. Co.,* 85 Cal.App.3d 105, 149 Cal.Rptr. 313 (1978).

Further, we see no threat to comity between the state and federal courts, nor any intrusion into sensitive matters of local concern, arising from this lawsuit. Given the importance of this matter to the debtor and the need for an expeditious resolution of it, discretionary abstention would clearly be inappropriate. *In re Boughton, supra,* at 316; *In re DeLorean Motor Co., supra,* 49 B.R. 900, 13 B.C.D. at 66.

Having resolved the issues touching on this Court's jurisdiction, we turn to the fourth-layer's motion to dismiss for failure to state a claim. Those defendants contend that the occurrence which led to the loss sustained by debtor was the April 14, 1978 termination of McCullough's employment, and that none of the fourth layer policies cover an occurrence which arose in 1978.

█ While the fourth-layer's position may eventually be adopted, it is simply too early in the case to so hold. We are precluded from granting a motion to dismiss under Rule 12(b)(6) "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983) *cert. denied,* — U.S. ——, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984). We cannot say "beyond doubt" that the defendants are correct in their assertion.

Accordingly, for the reasons stated above, the motions to dismiss under Rules 12(b)(1) and 12(b)(6) are hereby DENIED. The motions to abstain are also DENIED.

IT IS SO ORDERED.