In re ALBION DISPOSAL, INC., I & J Disposal of Western New York, Inc., J & I Disposal, Inc., 11372 Main Street, Inc., Orleans Sanitary Landfill, Inc., Debtors.

Craig A. SLATER, as Trustee of Albion Disposal, Inc., I & J Disposal of Western New York, Inc., J & I Disposal, Inc., and Orleans Sanitary Landfill, Inc., and Waste Management of New York, Inc., Plaintiffs/Appellees,

v.

TOWN OF ALBION and Town Board of Town of Albion, Defendants/Appellants.

No. 97–CV–0024E(SC).
No. AP 96–1093K.

United States District Court, W.D. New York.

Aug. 11, 1997.

Joseph Zagraniczny, Scott R. Hatz, Bond, Schoeneck & King, Syracuse, NY, for Waste Management of New York, Inc.

Cheryl R. Storie, Julia S. Kreher, Hodgson, Russ, Andrews, Woods & Goodyear, Christopher K. Reed, Buffalo, NY, for Town of Albion and Town Board of Town of Albion.

Raymond Fink, Harter, Secrest & Emery, Buffalo, NY, for Craig A. Slater.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

Presently before this Court is an appeal by defendants-appellants Town of Albion and Town Board of the Town of Albion (collectively, "the Town") from an order of the Bankruptcy Court dated December 12, 1996 ("the December 12 Order") that denied the Town's motion to dismiss this adversary proceeding. For the reasons set forth below, the December 12 Order will be affirmed.

For purposes of the instant appeal, the allegations made by the plaintiffs-appellees are deemed true. The following statement of facts is taken from the Amended Complaint that they filed June 27, 1996. The accompanying summary of this proceeding's procedural history is drawn from the Record on Appeal that was filed March 4, 1997.

Involuntary Chapter 11 bankruptcy petitions were filed against I & J Disposal of Western New York, Inc. ("I & J"), J & I Disposal, Inc. ("J & I") and Albion Disposal, Inc. ("Albion Disposal") on August 5, 1991. On August 14, 1991 Orleans Sanitary Landfill, Inc. ("OSL") and 11372 Main Street, Inc. ("11372 Main") filed voluntary Chapter 11 bankruptcy petitions. On December 3, 1991 the Bankruptcy Court appointed plaintiff Slater ("the Trustee") as the Chapter 11 Trustee of I & J, J & I, Albion Disposal, 11372 Main and OSL ("the Debtors").

Prior to filing for bankruptcy protection, OSL operated a "municipal solid waste management facility"—in layman's terms, a landfill—on a 35–acre parcel of land in Albion.[1] OSL operated that landfill ("the Landfill") from October 1983 until December 1990.[2] In April 1989 OSL filed applications ("OSL's DEC Applications") with New York's Department of Environmental Conservation ("the DEC") seeking permits to construct and operate (1) a "vertical expansion" of the Landfill and (2) a 154–acre "horizontal expansion" of the Landfill onto adjacent property owned, in whole or in part, by OSL. That adjacent property has been and will be referred to as "the Debtors' Premises."[3] OSL filed similar applications ("OSL's Town Applications") with the Town in 1990 pursuant to Chapter 49 of the Town Code ("Chapter 49"). OSL subsequently filed with both the Town and the DEC extensive hydrogeological data and environmental and engineering information regarding the expanded landfill that it was proposing.

In October 1990 OSL executed a consent order requiring it to close the Landfill pursuant to a closure plan that had been approved by the Town and the DEC. When the Debtors' bankruptcy petitions were filed in 1991, OSL was in breach of that consent order. Among other things, leachate from the Landfill posed a threat to the environment. Because of OSL's breach, the Town asked the Trustee to assume responsibility for leachate collection and ongoing maintenance until the Landfill was closed pursuant to the previously-approved closure plan. The Trustee did not have sufficient funds to perform that work.

At this point in time, the Trustee and the Debtors' creditors, including the Town—which had filed a proof of claim of approximately $2 million—, understood that the Debtors' "property" was limited to (1) the Debtors' Premises and (2) OSL's DEC and Town Applications (collectively, "the OSL Applications"). The Trustee and the creditors further understood that the Trustee should sell the Debtors' assets to the highest bidder as quickly as possible.

In November 1991 the Town urged the Trustee to expedite the closing of the Landfill by selling the Debtors' assets to a purchaser with the financial ability to close the Landfill and to pursue the OSL Applications. On December 9, 1991 the Town granted the Trustee an extension of time to find a buyer for the Debtors' Premises and the OSL Applications. In granting that extension, the Town passed a resolution denying OSL's Town Applications unless (1) the Town's environmental concerns were addressed in a feasible plan of operation and (2) other defaults under agreements and licenses that the Debtors had with the Town were remedied or guaranteed to be by an entity capable of fulfilling the Debtors' obligations. In January 1992 the Town advised the Bankruptcy Court, the Trustee and prospective purchasers that OSL's Town Applications would remain pending and that the Board would objectively review and process those applications if the Landfill's environmental problems were addressed and the Landfill properly closed. The Town subsequently advised the Trustee that it deemed the conditions attached to its December 9, 1991 resolution to have been fulfilled and represented that, if the Landfill were properly closed, OSL's Town Applications—or any supplemental or new applications—would be reviewed and processed in accordance with Chapter 49.

To satisfy the Town and the DEC, the Bankruptcy Court and the Trustee required the successful purchaser of the Debtors' Premises and the OSL Applications to close the Landfill in full compliance with the original closure plan. On April 24, 1992 the

---

**1.** Neither the Amended Complaint nor any other document filed in this proceeding identifies the owner of that 35–acre parcel.

**2.** Neither the Amended Complaint nor any other document filed in this proceeding explains the nature of the relationship, if any, between the Landfill and I & J, J & I, Albion Disposal and 11372 Main (the Debtors other than OSL).

**3.** Despite referring to the adjacent property as "the Debtors' Premises," the plaintiffs have not explained the nature of the relationship, if any, between the Debtors' Premises and Debtors other than OSL.

Bankruptcy Court approved (1) the lease of the Debtors' Premises to plaintiff Waste Management of New York, Inc. ("WMNY"), a non-debtor, and (2) the assignment of the OSL Applications to WMNY pursuant to a letter of intent obligating WMNY to act as the Trustee's contractor and to close the Landfill.

In January 1993 the Trustee, the Town and the DEC executed new consent orders under which WMNY would correct the Landfill's environmental problems and close it pursuant to a new closure plan. At the same time WMNY executed guarantees promising that it would fully perform the Debtors' obligations under the consent orders and the new closure plan. Over the next fifteen months, WMNY closed the Landfill in accordance with the new closure plan and satisfied all of the Trustee's obligations under the 1993 consent orders. In December 1993 the Trustee assigned the OSL Applications to WMNY [4] and amended the lease with WMNY ("the Lease") to include all of the Debtors' Premises. WMNY spent more than $5 million in connection with the above-described activities. In addition to WMNY's expenditures, the Trustee paid the Town approximately $650,000 in 1993, including $150,-000 when the Lease was amended and approximately $400,000 as "host fees" when WMNY was closing the Landfill.

WMNY and the Town engaged in all of this conduct in reliance on the Town's repeated representations that it would review and process the OSL's Town Applications—or any supplemental or new applications relating to the Debtors' Premises—in accordance with Chapter 49.

Under the Lease, WMNY leases the Debtors' Premises for 48 years for the sole purpose of constructing and operating a landfill. The Lease further obligates WMNY to proceed diligently in obtaining all of the permits that are necessary to construct and operate a landfill on the Premises. Until WMNY receives those permits, WMNY pays a monthly rent of $200. Upon receipt of the permits, WMNY will pay the Trustee approximately $5.2 million in pre-paid rent. Once the new landfill becomes operational, WMNY will pay the Trustee $3.50 for every ton of municipal solid waste deposited therein. Under the Trustee's proposed plan of reorganization, WMNY's lease payments will be used to pay the claims of the Debtors' creditors.

If the Town had not represented that it would review and process OSL's Town Applications—or any new or supplemental applications—pursuant to Chapter 49, WMNY and the Trustee would not have executed the above-described consent orders, guarantees and leases, would not have expended the significant sums of money discussed above and would not have closed the Landfill. Those actions were taken in direct reliance on the Town's representations. Those representations also led the Trustee and WMNY to believe that they had a binding agreement with the Town. As the plaintiffs understood it, that agreement obligated the Town to review and process OSL's Town Applications—or any new or supplemental applications—in accordance with Chapter 49 if the plaintiffs took the above-described actions.

After performing extensive testing on the Debtors' Premises and properties adjacent to the Premises, WMNY decided to reduce the scale of the proposed landfill from 154 acres to approximately 72 acres. That decision prompted WMNY to file, on March 24, 1995, revised applications ("the WMNY Applications") reflecting such scaled-down landfill.[5] On December 4, 1995 WMNY filed additional information with the Town in order to satisfy the requirements of Chapter 49. On December 21, 1995 the Town Attorney confirmed that the WMNY Applications were "complete for purposes of Chapter 49's technical requirements."

Beginning in January 1996, the Town commenced a course of action aimed at (1) preventing further consideration of the WMNY Applications and (2) prohibiting all solid

---

**4.** Apparently, this assignment formalized the letter of intent that was executed in April 1992.

**5.** It is unclear from the Amended Complaint whether WMNY filed revised applications with both the Town and the DEC or with the Town only. It is equally unclear whether the WMNY Applications superseded the OSL Applications.

waste management facilities in the Town. That course of action was led by Town Board members who had been newly elected thereto in November 1995.

At a special meeting of the Town Board held on January 5, 1996, certain members of the Board determined that a moratorium on consideration of landfill applications and a resolution to return the WMNY Applications would be considered at the next regularly scheduled Board meeting, which was scheduled to take place on January 8, 1996. The January 5 meeting was held without proper notice to Board members and the public and was not attended by all Board members.

At the January 8, 1996 meeting, the Board passed resolutions (1) adopting a 120–day moratorium on consideration of landfill-license applications under Chapter 49 and (2) returning the WMNY Applications to WMNY. Both resolutions were passed without proper public notice or publication. The Town Board subsequently returned the WMNY Applications. At a February 12, 1996 Board meeting, the Board passed a resolution ratifying the 120–day moratorium on consideration of landfill applications. That action was also taken without proper public notice.

Between March 11, 1996 and June 10, 1996, the Town Board passed a series of ordinances ("the Local Laws"), the net effect of which was a complete prohibition of all landfills—including the landfill proposed in the WMNY Applications—in the Town of Albion.

On April 9, 1996 the Trustee and WMNY commenced this adversary proceeding in the Bankruptcy Court.[6] The Amended Complaint was filed June 27, 1996 and asserts four causes of action. The first cause of action alleges that the Local Laws violate the so-called "automatic stay provision" of the Bankruptcy Code, 11 U.S.C. § 362, and cannot be enforced as to the plaintiffs, the Debtors' Premises or the OSL and WMNY Applications unless the Town seeks a modification of the stay from the Bankruptcy Court. The second cause of action alleges that, having taken actions and made statements upon which the Debtors and WMNY reasonably relied to their detriment and having received benefits as a result of those actions and statements, the Town is estopped from applying the Local Laws to the plaintiffs, the Debtors' Premises and the OSL and WMNY Applications. The third cause of action alleges that by changing its position in reasonable reliance on the Town's representations and by giving the Town the benefits demanded by it, WMNY obtained (1) a "vested right" in the OSL and WMNY Applications and (2) the right to an objective review and processing of those applications pursuant to Chapter 49. Although New York law recognizes a "vested rights" cause of action, such appears to be inapplicable to the facts of this case. *See Pete Drown v. Town Bd. of Ellenburg,* 229 A.D.2d 877, 646 N.Y.S.2d 205, 206 (3d Dep't) (setting forth the elements of a "vested rights" cause of action under New York law), *lv. to app. denied,* 89 N.Y.2d 802, 653 N.Y.S.2d 279, 675 N.E.2d 1232 (1996). Thus, it appears that the plaintiffs' third claim is another estoppel claim. Specifically, it appears that the plaintiffs are contending that the Town is estopped from refusing to review and process the OSL and WMNY Applications pursuant to Chapter 49. For purposes of this decision, the plaintiffs' second and third causes of action will be treated as estoppel claims. The fourth cause of action alleges that the Town has breached its agreement to review and process the OSL and WMNY Applications pursuant to Chapter 49. As relief, the Amended Complaint seeks an order (1) declaring that the Local Laws are either "inapplicable" to WMNY, the OSL and WMNY Applications and the Debtors' Premises or are "null and void" and (2) enjoining the Town from enforcing the Local Laws.

After commencing this proceeding, the plaintiffs initiated a declaratory judgment action in the New York Supreme Court for Orleans County. The plaintiffs filed an amended complaint in that action in June 1996. That amended complaint seeks essentially the same equitable relief that the plaintiffs seek in this proceeding and also seeks $3 million in damages. Although the complaint in the state court action asserted the same

---

**6.** Part VII of the Bankruptcy Rules governs such adversary proceedings.

causes of action that are asserted in this proceeding, the amendment thereof asserts none of those causes of action.

In July 1996 the Town moved to dismiss the Amended Complaint in this proceeding. In support of that motion, the Town argued (1) that the plaintiffs' first cause of action ("the automatic stay claim") should have been dismissed for failure to state a claim upon which relief can be granted and (2) that the remaining causes of action should have been dismissed (a) on the ground that the Bankruptcy Court lacked subject matter jurisdiction over those claims or (b) on the ground that the Bankruptcy Court was required to abstain from hearing those claims or (c) on the ground that the Bankruptcy Court should, in its discretion, have chosen to abstain from hearing those claims. As discussed in more detail *infra*, the December 12 Order denied that motion in its entirety.

Upon receiving the December 12 Order, the Town appealed from all aspects thereof from which it had a right to appeal under 28 U.S.C. § 158(a)(1).[7] The Town also requested leave to appeal from the remaining portions of the December 12 Order pursuant to 28 U.S.C. § 158(a)(3) and Bankruptcy Rule 8003.[8] By Order dated February 11, 1997, this Court granted that request. Consequently, every aspect of the December 12 Order is before this Court. In reviewing the same, this Court must conduct a *de novo* review of the Bankruptcy Court's conclusions of law. *See In re Bonnanzio,* 91 F.3d 296, 300 (2d Cir.1996); *In re Porges,* 44 F.3d 159, 162 (2d Cir.1995).

The Town moved to dismiss the plaintiffs' automatic stay claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCvP").[9] A motion to dismiss pursuant to FRCvP 12(b)(6) may not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to re-

lief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *see also Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994). The Bankruptcy Court was required to accept as true the material facts alleged in the Amended Complaint and to draw all reasonable inferences in favor of the plaintiffs. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995). The Bankruptcy Court was not entitled to consider matters outside the pleadings or to weigh evidence that might be presented at trial. The sole inquiry raised by the plaintiffs' FRCvP 12(b)(6) motion is whether the Amended Complaint is legally sufficient. *See LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

The plaintiffs' automatic stay claim is based on the Bankruptcy Code's provision therefor—*viz.,* 11 U.S.C. § 362(a). Subsections 362(a)(1) through 362(a)(8) define the scope of the automatic stay by listing certain acts that are stayed by the filing of a bankruptcy petition. The plaintiffs allege that the defendants' actions fall within subsection 362(a)(3), which provides, in pertinent part, that unless the Code expressly provides otherwise, the filing of a petition for reorganization operates as a stay, applicable to "all entities," of "any act * * * to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The stay of section 362(a) is "automatic" because it is triggered as to all concerned entities upon the filing of a bankruptcy petition, regardless of whether those entities are aware that a petition has been filed. *See Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 527 (2d Cir.1994); *Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1204 (3d Cir.1991). It is clear from the legislative history of section 362 that Congress intended the automatic stay to be broadly enforced so as to further some of

---

7. Section 158(a)(1) provides that district courts have jurisdiction to hear appeals from "final judgments, orders and decrees" of bankruptcy courts.

8. Section 158(a)(3) provides that district courts have jurisdiction to hear appeals from "interlocutory orders and decrees" of bankruptcy courts as long as the district court has granted the

appellant leave to appeal. Bankruptcy Rule 8003 sets forth the proper manner for moving for such leave to appeal.

9. Bankruptcy Rule 7012(b) makes FRCvP 12(b) through 12(h) applicable to adversary proceedings.

the paramount objectives of federal bankruptcy law.

"The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy."

"The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally." H.R.Rep. No. 595, 95th Congress, 2d Sess. 340–342, reprinted in 1978 U.S.Code Cong. & Admin.News ("U.S.C.C.A.N.") 5963, 6296–6298. See also S.Rep. No. 989, 95th Cong., 2d Sess. 49–51, reprinted in 1978 U.S.C.C.A.N. 5787, 5835–5836; In re Ionosphere Clubs, Inc., 922 F.2d 984, 989–990 (2d Cir.1990), cert. denied, 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991).

The plaintiffs' contention that the Town has committed an "act to exercise control over property of the estate" raises the question of what constitutes "property of the estate." Under subsection 541(a)(1) of the Bankruptcy Code, "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Under subsection 541(a)(7), property of the estate also includes "[a]ny interest in property that the [debtor's] estate acquires after the commencement of the [bankruptcy] case." 11 U.S.C. § 541(a)(7). Congress intended that "property of the estate" be broadly construed.

"Under [§ 541(a)(1)], the estate is comprised of all legal or equitable interest[s] of the debtor in property, wherever located, as of the commencement of the case. The

scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action * * * and all other forms of property currently specified in [the predecessor statute to § 541]. * * * The debtor's interest in property also includes 'title' to property, which is an interest, just as are [sic] a possessory interest, or leasehold interest, for example." S.Rep. No. 95–989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S.C.C.A.N. 5787, 5868.

"[Property of the estate] includes all interests, such as interests in real or personal property, tangible and intangible property, choses in action, causes of action, rights such as copyrights, trade-marks, patents, and processes, contingent interests and future interests, whether or not transferable by the debtor." H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 175–176, reprinted in 1978 U.S.C.C.A.N. 5963, 6136.

Courts have construed "property of the estate" in the manner that Congress envisioned. See, e.g., United States v. Whiting Pools, Inc., 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983); In re Prudential Lines Inc., 928 F.2d 565, 569 (2d Cir.), cert. denied, 502 U.S. 821, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991); In re Wegner Farms Co., 49 B.R. 440, 443 (Bankr.N.D.Iowa 1985).

■■■ The existence, nature and extent of the debtor's interest in a particular item of property are determined by applicable nonbankruptcy law. See Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); In re Prudential Lines, at 569; In re Howard's Appliance Corp., 874 F.2d 88, 93 (2d Cir.1989).[10] Whether the debtor's interest in that particular item qualifies as property of his estate is determined by bankruptcy law—specifically, subsections 541(a)(1) through 541(a)(7). See In re Prudential Lines, at 569; 11 U.S.C. § 541(a). Stated differently, federal bankruptcy law determines whether a certain interest—for example, an interest in real property, a contractual right or a cause of action—is the type of interest that can, under certain circumstances, qualify as property of the estate,

---

**10.** In this case, the parties agree that the law of New York is the applicable non-bankruptcy law.

and non-bankruptcy law (usually state law) determines whether that interest is such that it *does* in fact qualify as property of the estate. *See In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1101 (2d Cir.1990).[11]

Having set forth the basic legal principles that are relevant to the plaintiffs' automatic stay claim, this Court now considers the legal sufficiency of that claim.

In refusing to dismiss the automatic stay claim, the Bankruptcy Court reasoned as follows:

> "For the reasons set forth in the Plaintiffs' briefs and this Court's decision in *Slater v. Smith (In re Albion Disposal, Inc. et al.)*, 152 B.R. 794 (Bankr.W.D.N.Y. 1993), the Court holds that 'property of the estate' of one or more of these Debtors is being adversely affected by the [Local Laws]. Whether that is occurring permissibly or impermissibly, under [11 U.S.C. § 362], is a matter for discovery." Record on Appeal, at 331.

The question raised by the defendants' FRCvP 12(b)(6) motion is not whether the Local Laws have in fact adversely affected property of the Debtors' estate but rather is whether, assuming that the allegations set forth in the Amended Complaint are true, the defendants have committed an act to exercise control over property of the estate. Accordingly, this Court will examine (1) each of the Debtors' interests that could qualify as property of the estate and (2) whether, assuming the truth of the plaintiffs' allegations, the defendants have committed an act to exercise control over any of those interests.

 Before examining those issues, this Court must determine whether it may consider the plaintiffs' allegations regarding the underlying motivations that led the Town to enact the Local Laws. This Court must make that determination because the plaintiffs allege that the Local Laws, although facially neutral (*i.e.*, they do not mention the Debtors, the Debtors' Premises or the plaintiffs),[12] were "targeted" directly at certain of the Debtors' interests.

It is a fundamental principle of adjudication that judicial inquiries into legislative motivation are to be avoided. *See, e.g., United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968) ("this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive"); *McCray v. United States*, 195 U.S. 27, 56, 24 S.Ct. 769, 776–77, 49 L.Ed. 78 (1904) ("[t]he decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful [legislative] power on the assumption that a wrongful purpose or motive has caused the power to be exerted"). This principle applies to legislation passed by federal, state and local legislative bodies. *See Somers Realty Corp. v. Harding*, 886 F.Supp. 386, 390 (S.D.N.Y.1995); *Redco v. Town of Oyster Bay*, 87 A.D.2d 647, 449 N.Y.S.2d 5, 5 (2d Dep't 1982). Judicial inquiries into legislative motive represent "a substantial intrusion" into the workings of the legislative branch of government and endanger the doctrine of the separation of powers. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 268 n. 18, 97 S.Ct. 555, 565, 50 L.Ed.2d 450 (1977). The United States Supreme Court adopted a general prohibition on such inquiries out of respect for the political process and because of the difficulties inherent in determining the motives of a collective body. *See O'Brien*, at 383–384, 88 S.Ct. at 1682–1683.[13]

---

**11.** Because section 541 of the Bankruptcy Code states that property of the estate includes all legal and equitable interests of the debtor *in property*, the defendants argue that only "property interests," as determined by non-bankruptcy law, can constitute property of the estate. While that position may be consistent with the literality of section 541, it is inconsistent with the statute's legislative history as well as with the manner in which courts have construed "property of the estate." For example, even though causes of action and contract rights do not constitute "prop-

erty interests" under non-bankruptcy law, it is well-settled that causes of action and contract rights can be "property of the estate" under section 541.

**12.** The Local Laws simply prohibit all landfills in the Town of Albion.

**13.** Courts may, of course, examine the legislative history and stated purposes of a particular statute in order to better *understand* that statute. *See O'Brien*, at 383–384, 88 S.Ct. at 1682–1683.

Although there are exceptions to this general principle, such are limited and narrow. They consist primarily of instances in which "the very nature of the constitutional question requires an inquiry into legislative purpose." *O'Brien,* at 383 n. 30, 88 S.Ct. at 1683 n. 30. In most of such cases, the plaintiff is claiming that the legislation at issue violates a fundamental constitutional right. *See South Carolina Educ. Ass'n v. Campbell,* 883 F.2d 1251, 1259 (4th Cir.1989) (categorizing the types of cases that fall within this exception), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990). That clearly is not the instant case. *See ibid.* Judicial inquiry into legislative motive is also allowed if the legislation at issue is a bill of attainder. *See O'Brien,* at 383 n. 30, 88 S.Ct. at 1683 n. 30; *United States v. Lovett,* 328 U.S. 303, 315–316, 106 Ct.Cl. 856, 66 S.Ct. 1073, 1078–79, 90 L.Ed. 1252 (1946); *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370, 402–405 (N.D.N.Y.1987), *aff'd in part and vacated in part on other grounds,* 888 F.2d 230 (2d Cir.1989). Once again, that exception is of no help to the plaintiffs because the Local Laws clearly are not bills of attainder. *See ibid.* This Court is not aware of any exception to the general prohibition on judicial inquiries into legislative motive that would apply to the facts of the instant case. This Court's analysis of the plaintiffs' automatic stay claim must, therefore, be limited to the face of the Local Laws. *See South Carolina Educ. Ass'n,* at 1259 (holding that it was improper for the district court to inquire into the motives of the South Carolina General Assembly because the legislation at issue was "not among the limited and well defined exceptions to the principle discouraging judicial inquiry into legislative motive"). The plaintiffs' allegations regarding the Town's motives in adopting those Laws will be disregarded as irrelevant.

*International Paper v. Inhabitants of Town of Jay,* 736 F.Supp. 359 (D.Me.1990), *aff'd,* 928 F.2d 480 (1st Cir.1991), illustrates these principles in a factually similar context. Involved was an ordinance that had been drafted and proposed by town selectmen and thereafter adopted by a referendum vote. The plaintiff sought to invalidate the ordinance on the ground that the selectmen had drafted and proposed the ordinance in order to further their own pecuniary interests and to punish the plaintiff. The Court reviewed the exceptions to the general principle that courts may not inquire into legislative motive, found that the facts of that case did not fall within any of those exceptions and ruled that the selectmen's motives were irrelevant. *See* 736 F.Supp. at 362–365. The same result is warranted here.

The plaintiffs have identified several interests over which the Town allegedly has attempted to exercise control. Those interests will be examined *seriatim.*

■ The plaintiffs first point to the Debtors' Premises. The defendants do not dispute that the Premises are property of the Debtors' estate.[14] The dispositive question, therefore, is whether the Local Laws could, under any circumstances, be considered an act to exercise control over the Premises. This Court concludes that they could not.

Prior to 1984, 11 U.S.C. § 362(a)(3) provided that the filing of a bankruptcy petition stayed "any act to obtain possession of property of the estate or of property from the estate." *See In re General Associated Investors Ltd.,* 159 B.R. 551, 555 (Bankr.D.Ariz.1993). In 1984 section 362(a)(3) was amended to add the phrase "or to exercise control over property of the estate." *See In re National Cattle Congress, Inc.,* 179 B.R. 588, 595 (Bankr.N.D.Iowa 1995), *remanded on other grounds,* 91 F.3d 1113 (8th Cir.1996).

What courts generally may not do, however, is look beyond the face of the statute, its legislative history and its stated purposes in order to determine whether the statute should be *invalidated* or *enjoined* because of the personal ideations of the legislators who voted in favor of the statute. *See ibid.*

14. Technically, the Debtors' interests in the Premises, and not the Premises themselves, are

included in the Debtors' estate. *See* 11 U.S.C. § 541(a)(1) (property of the estate includes "all legal or equitable *interests* of the debtor in property as of the commencement of the case") (emphasis added). Although this Court endeavors to be as accurate as possible, it would be overly cumbersome to continually refer to the to "the Debtors' interests in the Premises%"rather than "the Premises."

Although there is legislative history explaining the purposes of section 362(a)(3) in its original form, there is no legislative history explaining why the "control provision" was added in 1984. *See ibid.* Further, "control" is not defined in the Bankruptcy Code. Consequently, in determining whether the Local Laws could be regarded as an act to exercise control over the Premises, this Court is left with the language of the statute and the manner in which other courts have construed section 362(a)(3)'s control provision.

For the most part, courts have construed that provision broadly. For example, *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581 (9th Cir.1993), holds that the State of Hawaii had exercised control over property of a debtor corporation when it dissolved that corporation pursuant to state law. *See id.* at 586–587. In *In re J.F.D. Enterprises, Inc.,* 183 B.R. 342 (Bankr. D.Mass.1995), the debtor's property included a liquor license. Following the filing of its petition, the debtor agreed to sell its liquor license to a non-debtor subject to receiving approval of the sale from the Massachusetts Alcoholic Beverage Control Commission which had approved the sale on the condition that a limitation be placed on the license that would temporarily prevent the buyer from purchasing liquor products on credit. The Court held that imposing that condition was an act to exercise control over the license. *See id.* at 347–351. In *In re Bulldog Trucking, Inc.,* 150 B.R. 912 (Bankr.W.D.N.C. 1992), the debtor's estate included "rate undercharge claims." Pursuant to regulations that had been promulgated by the Interstate Commerce Commission ("the ICC"), the trustee was required to have those claims reviewed by the ICC before he could pursue them. If the ICC concluded that the claims were "colorable," he could then pursue them. If the ICC concluded that they were not colorable, the trustee was obligated to abandon the claims. Like the Local Laws, the ICC regulations were facially neutral and applied to all rate undercharge claims. Nevertheless, the Court held that the regulations constituted an act to exercise control over the debtor's rate undercharge claims. *See id.* at 913–915.

Although these cases show that a variety of actions can constitute acts to "exercise control over property of the estate," each case nevertheless involved a direct connection between the conduct stayed and the debtor's property. In *Hillis Motors,* dissolution of the debtor corporation had the effect of transferring ownership of the corporation's assets from the corporation to its shareholders. *See* 997 F.2d at 586. Thus, the State had, in effect, assumed direct control over the corporation's assets and transferred them to the shareholders. In *J.F.D. Enterprises,* the Commission had taken a direct action against the debtor's liquor license. In *Bulldog Trucking,* the ICC regulations, although facially neutral, effectively transferred control over the debtor's rate undercharge claims from the trustee to the ICC.

In the instant case, there is no direct connection between the Town's actions and the Debtors' Premises. The Local Laws are facially neutral and thus apply to all property in the Town of Albion. Other than the plaintiffs' allegations of "targeting," which are legally irrelevant, there is no formal connection between the Local Laws and the Premises. Both before and after the Local Laws were enacted, the Town had no direct involvement in managing the Premises. That was—and still is—the Trustee's responsibility. This Court has not been able to locate any case finding a violation of section 362(a)(3) where the connection between the conduct stayed and the property at issue was as tenuous as is the connection between the Local Laws and the Debtors' Premises.

Of course, assuming the truth of the plaintiffs' allegations, the Local Laws have greatly reduced the value of—*i.e.,* adversely affected—the Premises. The plaintiffs attach great significance to that allegation. Nevertheless, section 362(a)(3) does not stay acts that reduce the value of property of the estate; it stays acts to exercise control over estate property. Although a few courts have stated—usually in *dicta*—that acts which reduce the value of property of the debtor are acts to exercise control over the debtor's

property,[15] that position does not find any support in the Bankruptcy Code.

*Wade v. State Bar of Arizona,* 115 B.R. 222 (9th Cir. BAP 1990), *aff'd,* 948 F.2d 1122 (9th Cir.1991), is revealing in this regard. The debtor in *Wade* was an attorney. One day after he had filed a Chapter 11 bankruptcy petition, the Arizona State Bar ("the Bar") initiated a disciplinary proceeding against him. The bankruptcy court held that the automatic stay provision did not apply to the disciplinary proceeding. On appeal, the debtor argued that the disciplinary proceeding was an act to exercise control over his law practice in violation of section 362(a)(3). The Bankruptcy Appellate Panel for the Ninth Circuit Court of Appeals rejected that argument, reasoning that, to the extent that the debtor's law practice—including any goodwill associated with the practice—was property of the estate, the Bar was not attempting to exercise control over his practice. The Appellate Panel reached that decision even though the value of the debtor's practice would obviously be reduced if the disciplinary proceedings resulted in the revocation of the debtor's license to practice law. *See id.* at 228–229. In much the same way— assuming the truth of the plaintiffs' allegations—the Town has not attempted to exercise direct control over the Debtors' Premises, although its actions may very well have had the indirect effect of dramatically reducing the value of the Premises.

The plaintiffs also argue that the Local Laws were an act to exercise control over the Premises because the Laws prohibited them from using that property in the manner in which they had intended. Once again, that position does not find support in the Bankruptcy Code, inasmuch as section 362(a)(3) does not stay acts simply because they may have an indirect effect of limiting the manner in which the debtor had intended to use his property.

The plaintiffs next contend that the Debtors' interests in the Lease are property of the estate over which the Town attempted to

exercise control when it passed the Local Laws. This Court must reject that argument for precisely the same reasons that it has rejected the plaintiffs' argument regarding the Debtors' Premises. Specifically, although the Debtors' interests in the Lease unquestionably constitute property of the estate, the Local Laws cannot be said to have been an act to exercise control over those interests. The Local Laws neither mention the Lease nor directly interfere with the rights and obligations arising under that instrument. While the Local Laws do have an indirect effect on the Lease—*viz.,* they ensure that the Debtors will receive relatively little money from WMNY under the Lease—, that indirect effect does not amount to control over the Lease.

■ The plaintiffs' next argument is that the Debtors' interests in the OSL and WMNY Applications are property of the Debtors' estate over which the Town has attempted to exercise control. This argument fails because the OSL and WMNY Applications are not property of the Debtors' estate. The Debtors have assigned their rights under, and interests in, the OSL Applications to WMNY, a non-debtor. Once that assignment had been completed, the OSL Applications could no longer be property of the estate. *See In re Hall's Motor Transit Co.,* 889 F.2d 520, 522 (3d Cir.1989) ("[t]he bankruptcy court's jurisdiction does not follow the [debtor's] property, but rather, it lapses when the property leaves the debtor's estate").[16] Similarly, the WMNY Applications never could have been property of the Debtors' estate because they were submitted by WMNY, not by the Debtors. Like the OSL Applications, the WMNY Applications are "owned" by WMNY.

The plaintiffs argue that the OSL and WMNY Applications may still be property of the estate because the Debtors retain an "interest" in the Applications. While that may be true, that interest is insufficient to constitute property of the Debtors' estate.

---

**15.** *See, e.g., In re J.F.D. Enterprises, Inc.,* 183 B.R. at 348–349; *Matter of Scott Housing Systems, Inc.,* 91 B.R. 190, 194–195 (Bankr.S.D.Ga. 1988).

**16.** In any event, it appears that the OSL Applications have been mooted by the WMNY Applications and thus are no longer relevant to this proceeding.

As discussed *supra*, "property of the estate" is limited to the Debtors' legal and equitable interests in property. *See* 11 U.S.C. § 541(a)(1). Even assuming the truth of the plaintiffs' allegations, the Debtors do not have a legal or equitable interest in the OSL and WMNY Applications. All such interests are held by WMNY. At most, the Debtors have an indirect *financial* interest in the Applications—*i.e.*, the Debtors' estate will receive a considerable amount of money if the Applications are approved and will receive very little money if the Applications are rejected. Any such financial interest is not a legal or equitable interest in the Applications. *Cf. Whiting Pools*, at 204 n. 8, 103 S.Ct. at 2314 n. 8 ("Congress intended to exclude from the [debtor's] estate property of others in which the debtor has some minor interest such as a lien or bare legal title").[17] In order to find that the plaintiffs have an "interest" in the OSL and WMNY Applications within the meaning of section 541(a)(1), this Court would have to ignore the language of the statute, its legislative history and the manner in which other courts have interpreted it.[18] Moreover, even if the Debtors did have a legal or equitable interest in the OSL and WMNY Applications, that interest would not constitute an interest in property under section 541(a)(1). Under New York law, filing an application such as the OSL and WMNY Applications does not confer any rights or privileges upon the applicant. *See, e.g., Suffolk Pines, Inc. v. Harwood*, 14 Misc.2d 826, 178 N.Y.S.2d 732, 735 (N.Y.Sup. Ct. Suffolk Co.1958), *aff'd*, 199 N.Y.S.2d 726 (App. Div.2d Dep't 1960). Absent an enforceable right or privilege accruing to the Debtors by virtue of the Applications having been filed, any purported interest of the Debtors in those Applications would be insuf-

ficient to constitute an interest in property under the Bankruptcy Code.[19]

The plaintiffs' next contention is that the Debtors have "statutory zoning rights" over which the Town has attempted to exercise control. If true, the Town would be in violation of the automatic stay because it is beyond dispute that section 541(a)(1) encompasses statutory zoning rights. *See, e.g., Matter of Scott Housing Systems, Inc.*, 91 B.R. 190, 194 (Bankr.S.D.Ga.1988). This argument is of no avail to the plaintiffs, however, because the Amended Complaint does not allege that the Debtors have statutory zoning rights. Indeed, despite asserting in their brief that the Debtors have statutory zoning rights, the plaintiffs do not explain either what zoning rights they have or how they acquired those rights. Those omissions are revealing, because it appears from the Amended Complaint that the Debtors do not have any statutory zoning rights.

The plaintiffs' next argument is that the Debtors' rights under their alleged agreement with the Town constitute property of the estate over which the Town has attempted to exercise control. Specifically, the plaintiffs allege (1) that pursuant to the Debtors' agreement with the Town, the Debtors have the right to have the Applications reviewed in accordance with Chapter 49, (2) that this right is property of the Debtors' estate and (3) that the Town attempted to terminate—*i.e.*, exercise control over—that right in violation of section 362(a)(3) when it passed the Local Laws. If the plaintiffs were able to prove each of these allegations, they would have established a claim under section 362(a)(3) because it is well-established (1) that a debtor's contractual rights—including rights arising under post-petition contracts—are included in the

---

**17.** The plaintiffs' appellate brief refers to the Debtors' "reversionary interest" in the OSL and WMNY Applications. *See* Respondents' Brief on Appeal, filed April 1, 1997, at 23 n. 8 & 24 n. 9. Such a reversionary interest is neither alleged in the Amended Complaint nor explained in the plaintiffs' appellate brief. The alleged reversionary interest will, therefore, be disregarded.

**18.** Consider the following example. A owns a parking lot located across the street from an amusement park owned by B. Eighty percent of

A's customers are visitors to B's amusement park. Thus, A clearly has a significant financial interest in the success of B's amusement park. Nevertheless, should A file for bankruptcy protection, his financial "interest" in the amusement park clearly would not be included in his estate.

**19.** The Debtors' financial "interest" in the Applications is perhaps best characterized as an unenforceable expectancy of income should the Applications be approved.

property of his estate and (2) that an attempt to terminate those rights is an act to exercise control over property of the debtor's estate. See In re Carroll, 903 F.2d 1266, 1270–1271 (9th Cir.1990); In re Alert Holdings, Inc., 148 B.R. 194, 202 (Bankr.S.D.N.Y.1992); Matter of American Cent. Airlines, Inc., 52 B.R. 567, 570 (Bankr.N.D.Iowa 1985); In re Wegner Farms Co., 49 B.R. 440, 443 (Bankr. N.D.Iowa 1985). The dispositive question for present purposes, therefore, is whether the Debtors could, under any circumstances, have a contractual right to have the Applications reviewed and processed in accordance with Chapter 49. This Court holds that they could not.

Under New York law, the Town Board could not enter into a contract limiting or impairing the discretionary authority of future Town Boards in areas relating to governmental or legislative functions unless it was specifically authorized to do so by statute or charter provision. See Morin v. Foster, 45 N.Y.2d 287, 293, 408 N.Y.S.2d 387, 380 N.E.2d 217 (1978); Lake v. Binghamton Housing Authority, 130 A.D.2d 913, 516 N.Y.S.2d 324, 325–326 (3d Dep't 1987); Quigley v. City of Oswego, 71 A.D.2d 795, 419 N.Y.S.2d 27, 29 (4th Dep't), app. denied, 48 N.Y.2d 607, 422 N.Y.S.2d 1025, 397 N.E.2d 1189 (1979); Edsall v. Wheler, 29 A.D.2d 622, 285 N.Y.S.2d 306, 307–308 (4th Dep't 1967). The plaintiffs have not alleged that the Town Board was authorized to bind future Boards with respect to landfill applications, and it is beyond dispute that reviewing and processing landfill applications is a governmental function. Thus, even if the Debtors and the Town had agreed that the Town would review and process the OSL and WMNY Applications pursuant to Chapter 49, such agreement would be invalid and unenforceable. See Morin, at 295, 408 N.Y.S.2d 387, 380 N.E.2d 217; Lake, at 326; Quigley, at 29; Edsall, at 308. Accordingly, the Debtors' purported contract rights under the alleged agreement with the Town are not property of the estate and the attendant contract claim asserted in the Amended Complaint must be dismissed pursuant to FRCvP 12(b)(6).

▬▬▬ The plaintiffs' next contention is that "the Debtors' rights and interests created as a result of the Debtors' actions that were taken in reliance upon the Town's Representations" are property of the estate over which the Town has attempted to exercise control. See Respondents' Brief on Appeal, filed April 1, 1997, at 15. The plaintiffs are clearly referring to their estoppel claims. While this Court is not aware of any relevant authority in this area, it sees no reason why "estoppel rights"—i.e., a plaintiff's "right" to have the defendant estopped from doing something—could not be property of a debtor's estate in precisely the same way that contractual rights can be property of a debtor's estate. Similarly, if such rights can be property of the estate, seeking to terminate those rights can be an act to exercise control over property of the estate. Thus, the determinative question raised by the defendants' motion to dismiss is whether the plaintiffs have alleged a valid estoppel claim.

▬▬▬ Under New York law, estoppel may be applied to governmental entities only in those "exceptional cases" in which failing to apply estoppel would result in "manifest injustice." See Landmark Colony v. Bd. of Sup'rs, 113 A.D.2d 741, 493 N.Y.S.2d 340, 343 (2d Dep't 1985); 1555 Post Road Corp. v. Finance Admin., 61 A.D.2d 187, 401 N.Y.S.2d 536, 540 (2d Dep't 1978). This Court is satisfied that the plaintiffs here are entitled to pursue their estoppel claims for two reasons.

First, assuming the truth of the plaintiffs' allegations, this case appears to involve the type of exceptional circumstances that must be present before a governmental entity can be estopped. In many of the New York cases in which it was held that estoppel could not lie against a particular governmental entity, the plaintiff was seeking to prevent the entity from complying with its "statutory obligations." See, e.g., Parkview Associates v. City of New York, 71 N.Y.2d 274, 525 N.Y.S.2d 176, 519 N.E.2d 1372 (1988).[20]

---

**20.** In Parkview Associates, the City of New York erroneously issued a building permit that authorized the plaintiff to construct a building that did not comply with the City's zoning laws. When the City discovered its error, it revoked the building permit. The Court held that the City could

That is not the case here. The plaintiffs seek, in effect, an order estopping the Town from enacting and applying the Local Laws against them. The Town did not have a statutory duty to enact the Local Laws. Indeed, as the Town itself argues, enacting the Local Laws was a discretionary decision made by a newly-elected Town Board. Furthermore, to the extent that the Town now has a duty to apply the Local Laws to all property owners within the Town of Albion, it has that "duty" only because it enacted the Local Laws—the very conduct that is being challenged by the plaintiffs. A significant number of other "governmental estoppel" cases involve a plaintiff who is seeking an order stating that he should not be required to comply with the law as it had existed during the period of the conduct allegedly giving rise to his estoppel claim. *See, e.g., New York State Medical Transporters Assoc., Inc. v. Perales,* 77 N.Y.2d 126, 564 N.Y.S.2d 1007, 566 N.E.2d 134 (1990).[21] The plaintiffs here seek precisely the opposite. They complied with all applicable Town laws during the relevant time period. What the plaintiffs seek to estop is the Town's subsequent decision to change those laws.

Second, the plaintiffs have alleged that "manifest injustice" will result if the Town is not estopped from enforcing the Local Laws against the Debtors, the Debtors' Premises and the plaintiffs. If the allegations in the Amended Complaint are true, the Town (1) persuaded the plaintiffs to (a) cure OSL's breaches of the 1990 Consent Order and close the OSL Landfill, (b) spend more than $5 million closing the OSL Landfill, (c) pursue the OSL and WMNY Applications and (d) pay the Town $650,000 and (2) persuaded the Bankruptcy Court to approve and facilitate the plaintiffs' actions by (3) repeatedly promising to review and process the OSL and WMNY Applications pursuant to Chapter 49. And yet, it is alleged, after receiving all of the benefits that it had demanded, the Town reneged on its promises and enacted the Local Laws. As a result of those Local Laws, the plaintiffs will lose more than $5 million and more than $40 million in creditor claims will never be paid. These allegations are sufficient to support a claim of manifest injustice. *See Landmark Colony,* 493 N.Y.S.2d at 343 (holding that manifest injustice would be suffered if the governmental entity were not estopped); *1555 Post Road Corp.,* 401 N.Y.S.2d at 540 (same).

The plaintiffs have, for yet another reason, alleged a valid estoppel claim. It is well-settled under New York law that estoppel may be applied to a governmental entity acting in a non-governmental, proprietary capacity. *See Planet Const. Corp. v. Bd. of Ed., N.Y. City,* 7 N.Y.2d 381, 385, 198 N.Y.S.2d 68, 165 N.E.2d 758 (1960); *Carney v. Newburgh Park Motors,* 84 A.D.2d 599, 444 N.Y.S.2d 220, 221 (3d Dep't 1981). The Amended Complaint alleges that "the Town was acting in a proprietary role in the bankruptcy proceedings." Record on Appeal, at 122. Specifically, the plaintiffs assert that the Town was acting in its capacity as an unsecured creditor of the Debtors when it engaged in the conduct alleged in the Amended Complaint.[22] That position states a cognizable estoppel claim against the Town.

To summarize, the Amended Complaint sufficiently alleges (1) cognizable estoppel claims against the Town and (2) that the Town attempted to exercise control over the

---

not be estopped from revoking the permit because it was merely enforcing its statutory duty to enforce the zoning laws as they had existed when the permit was issued. *See* 71 N.Y.2d at 279–282, 525 N.Y.S.2d 176, 519 N.E.2d 1372.

**21.** In *New York State Medical Transporters* the plaintiffs sought to compel the Department of Social Services ("the DSS") to process claims for services that they had rendered to Medicare patients without prior approval from the DSS. The plaintiffs conceded that they had known that prior approval was required when they performed the services at issue, but argued that the DSS was estopped from refusing to process their claims because it had not required prior approval in the past. The Court's rejection of that argument was grounded in sound reasons of public policy. First, the Court did not want to grant the plaintiffs a right to disobey a statute of which they were "well aware." Second, the Court did not want to impair the DSS's ability to enforce that statute. *See* 77 N.Y.2d at 129–131, 564 N.Y.S.2d 1007, 566 N.E.2d 134.

**22.** The Town's contention that it was acting in its governmental capacity rather than its proprietary capacity presents a question of fact that will have to be resolved by the factfinder.

rights arising out of those estoppel claims when it enacted the Local Laws. Consequently, the plaintiffs have stated a valid claim arising under section 362(a)(3) and the Bankruptcy Court did not err when it declined to dismiss the plaintiffs' automatic stay claim.

■ The Town argues that, to the extent that it may have violated section 362(a)(3), its actions were exempt from the Bankruptcy Code's automatic stay pursuant to 11 U.S.C. § 362(b)(4), which provides that the filing of a petition does not stay "the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power." 11 U.S.C. § 362(b)(4). This argument fails because, rather than seeking to stay the Town from "commencing or continuing" an "action or proceeding," the plaintiffs are seeking (1) to estop the Town from enforcing the Local Laws against them and (2) to compel the Town to comply with its alleged agreement with the plaintiffs. All of the cases cited by the Town in support of its argument that its actions fall within section 362(b)(4) involved some type of action or proceeding, such as a lawsuit or administrative proceeding, that had been, or was about to be, brought by a governmental unit. *See, e.g., Eddleman v. U.S. Dept. of Labor,* 923 F.2d 782 (10th Cir. 1991) (administrative action by the United States Department of Labor); *In re Lawson Burich Associates, Inc.,* 31 B.R. 604 (S.D.N.Y.1983) (state court lawsuit brought by the New York State Commissioner of Health). No such action or proceeding is present here.

The Town also argues that the plaintiffs are bound to comply with the Local Laws because 28 U.S.C. § 959(b) provides that "a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession * * * according to the requirements of the valid laws of the State in which such property is situated * * *." This argument fails because it is premised on the Town's contention that the Local Laws are "valid

laws"—the very question that is at issue in this proceeding.

The final issues to be addressed are whether the Bankruptcy Court has subject matter jurisdiction over the plaintiffs' claims and, if so, whether the Bankruptcy Court should have abstained from exercising jurisdiction over the plaintiffs' state law claims. The Bankruptcy Court ruled (1) that it has "core" jurisdiction over the plaintiffs' automatic stay and estoppel claims, (2) that the defendants' request for mandatory abstention was "inapposite" as to the plaintiffs' automatic stay claim and (3) that the defendants' request for discretionary abstention would be denied without prejudice to a later renewal following discovery. *See* Record on Appeal, at 342.

■ The first question for this Court is whether the automatic stay and estoppel claims are "core" or "non-core" proceedings.[23] The parameters of a federal bankruptcy court's subject matter jurisdiction are defined by 28 U.S.C. § 1334 and 28 U.S.C. § 157. Section 1334 gives district courts original, non-exclusive jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." Section 157 authorizes district courts to refer to bankruptcy courts the cases that are identified in section 1334. *See* 28 U.S.C. § 157(a). Section 157 also divides those proceedings arising under Title 11 into core and non-core proceedings. *See* subsections (b)(1) and (b)(2). Congress intended for "core proceedings" to be construed broadly. *See In re Ben Cooper, Inc.,* 896 F.2d 1394, 1398–1399 (2d Cir.), *vacated,* 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), *reinstated,* 924 F.2d 36 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991); *In re Harbor Park Associates Ltd. Partnership,* 112 B.R. 555, 558 (S.D.N.Y.1990). Bankruptcy courts are empowered to make final determinations regarding core proceedings. *See* 28 U.S.C. § 157(b)(1). With respect to non-core proceedings, a bankruptcy court's role is limited to submitting proposed findings of fact and conclusions of law to the

---

**23.** As discussed *supra,* the plaintiffs' contract claim must be dismissed pursuant to FRCvP 12(b)(6).

district court unless the bankruptcy court and the parties have agreed that such court may make final determinations. *See* 28 U.S.C. §§ 157(c)(1) & 157(c)(2).

■ The plaintiffs' automatic stay claim is unquestionably a core proceeding because it arises under Title 11—specifically, under section 362(a)(3) of Title 11. The defendants do not contest this point. With respect to the plaintiffs' estoppel claims, they too are core proceedings because they arose out of post-petition transactions between the defendants, the plaintiffs, the Debtors and the Bankruptcy Court. *See In re Ben Cooper,* at 1399–1400; *In re Luis Elec. Contracting Corp.,* 165 B.R. 358, 363–364 (Bankr. E.D.N.Y.1992); *In re Harbor Park Associates,* at 558–559; *In re SPI Communications & Marketing, Inc.,* 112 B.R. 507, 510–511 (Bankr.N.D.N.Y.1990).

■ Turning to the defendants' abstention arguments, mandatory abstention is inapposite because the plaintiffs' claims are core proceedings. *See In re SPI Communications,* at 512 (mandatory abstention does not apply to core proceedings); *In re Muir,* 107 B.R. 13, 17 (Bankr.E.D.N.Y.1989) (same). The defendants' discretionary abstention argument begins with 28 U.S.C. § 1334(c)(1), pursuant to which a bankruptcy court may abstain from hearing a particular proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law." Section 1334(c) summarizes and incorporates federal non-bankruptcy abstention principles. *See In re Pan American Corp.,* 950 F.2d 839, 846 (2d Cir.1991); *In re Parke Imperial Canton, Ltd.,* 177 B.R. 544, 549 (Bankr.N.D.Ohio 1994). Foremost among those principles is the concept that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Cons. Dist. v. U.S.,* 424 U.S. 800, 813 [96 S.Ct. 1236, 1243–44, 47 L.Ed.2d 483] (1976); *see also Allegheny County v. Mashuda Co.,* 360 U.S. 185, 188 [79 S.Ct. 1060, 1062–63, 3 L.Ed.2d 1163] (1959) ("[t]he doctrine of abstention * * * is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it"). Indeed, the inquiry triggered by an abstention motion is not whether

there is a substantial reason to exercise federal jurisdiction, but whether there are "exceptional circumstances" that justify surrendering that jurisdiction. *Moses H. Cone Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 25–26 [103 S.Ct. 927, 942, 74 L.Ed.2d 765] (1983).

■ Having carefully considered the defendants' arguments in favor of abstention, this Court concludes that the Bankruptcy Court properly declined to abstain from hearing the plaintiffs' claims. Abstention from hearing the plaintiffs' automatic stay claim obviously would have been inappropriate, inasmuch as that claim arises under the Bankruptcy Code. With respect to the plaintiffs' estoppel claims, several factors weigh against abstention. First, to the extent that the plaintiffs' automatic stay claim is premised on their contention that the defendants' actions were an act to exercise control over their "estoppel rights," the automatic stay and estoppel claims are intertwined. *See In re Parke Imperial Canton,* at 549–550 (refusing to abstain where the debtor-plaintiffs' state law claims were certain to raise bankruptcy law issues); *In re SPI Communications,* at 510 (declining to abstain from hearing a state law claim that would raise substantive and procedural issues of bankruptcy law). Second, the primary reason for abstaining from hearing a state law claim is that the claim involves unsettled or unusual issues of state law. *See In re Pan American Corp.,* at 846. Such is not the instant case. While the plaintiffs' estoppel claims are hardly routine, New York law regarding estoppel—including the application of estoppel against governmental entities—is well-developed. Third, the estoppel claims are core claims. *See In re Parke Imperial Canton,* at 548–549 (refusing to abstain from exercising jurisdiction over state law claims that were core claims). Fourth, the plaintiffs' estoppel claims are highly important to the Debtors' estate. Indeed, it is possible that, if those claims fail, more than $40 million in unsecured claims will go unpaid, whereas, if they succeed, all or most of those claims may eventually be paid. The plaintiffs' estoppel claims, combined with their automatic stay claim, are

almost certainly the most valuable "asset" of the Debtors' estate and should be resolved by the Bankruptcy Court. *See Matter of Baldwin–United Corp.*, 52 B.R. 541, 548 (Bankr.S.D.Ohio 1985) ("[g]iven the importance of this matter to the debtor and the need for an expeditious resolution of it, discretionary abstention would clearly be inappropriate"). Finally, the Bankruptcy Court's direct involvement in many of the events upon which the plaintiffs' estoppel claims are based weighs against abstention. *See In re Parke Imperial Canton,* at 549.

Accordingly, it is hereby **ORDERED** that the December 12 Order is **AFFIRMED** to the extent that the Bankruptcy Court refused to dismiss the plaintiffs' automatic stay claim pursuant to FRCvP 12(b)(6) and declined to abstain from exercising jurisdiction over the plaintiffs automatic stay and estoppel causes of action,[24] that the plaintiffs' contract cause of action is dismissed pursuant to FRCvP 12(b)(6) and that this action shall be remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

---

**24.** This Court expresses no opinion as to those issues in the December 12 Order that are not specifically addressed in this Memorandum and Order.